# DAVID ANDERSON ET AL. *v.* STATE OF MARYLAND

[No. 463, September Term, 1970.]

*Decided June 7, 1971.*

188

The cause was argued before MORTON, ORTH, THOMP-SON, MOYLAN and POWERS, JJ.

*Joseph Forer* for appellants.

*Clarence W. Sharp, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

## THE STATUTE

The fifty-nine appellants in this case claim that Md. Code, Art. 27, § 577 A (1) is unconstitutional on its face and as applied. They were found guilty of violating the statute by a jury at a joint trial in the Circuit Court for Prince George's County.[1] Section 577 A is entitled "Refusing to leave public buildings or grounds upon request" and subsection (1) reads:

"(1) *During regular closing hours.* — Any person refusing or failing to leave a public building or grounds, or specific portion thereof, of a public agency or public institution during those hours of the day or night when the building, grounds, or specific portion thereof, is regularly closed to the public, upon being requested to do so by a regularly employed guard, watchman or other authorized employee of the public agency or institution owning, operating or maintaining the building or property, if the surrounding circumstances are such as to indicate to a reasonable man that such person has no apparent lawful business to pursue at such place, shall be guilty of a misdemeanor, and upon conviction thereof shall be fined not more than $1,000.00, or imprisoned for not more than six months, or both, in the discretion of the court."

---

1. Eighty-four persons were charged, each upon a separate warrant, with violating Art. 27, § 577 A. Thereafter the State's Attorney issued two criminal informations, one naming sixty-nine of the persons charged in the warrants and the second naming the remaining fifteen persons. Each information consisted of two counts. The first count charged a violation of the common law in that the accused forcibly detained a building of the University of Maryland, which was in the possession of the Board of Regents, with such an array of force that it caused apprehension of the Board's agents of a breach of the peace. See IV Blackstone's Commentaries, ch. XI, 10, p. 148. The second count charged violation of Code, Art. 27, § 577 B. It seems that two of the accused pleaded guilty and the charges against the remaining eighty-two were consolidated for trial. Seventy-five were convicted under the warrants and fifty-nine of them appealed.

## I

Appellants contend that the statute is unconstitutional under the due process clause because of vagueness. We set out the test in this regard in *Lashley v. State,* 10 Md. App. 136, 142:

> "The requirement of a reasonable degree of certainty in legislation, especially in the criminal law, is a well established element of the guarantee of due process of law. No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed of what State law commands or forbids; consequently, a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law. *Lanzetta v. New Jersey,* 306 U. S. 451; *Connally v. General Construction Co.,* 269 U. S. 385."

Appellants' claim of unconstitutional vagueness here centers upon the clause "if the surrounding circumstances are such as to indicate to a reasonable man that such person has no apparent lawful business to pursue at such place." They assert (a) the meaning of "lawful business" is obscure; (b) it is made more obscure because it is not whether such person in fact had lawful business but whether it would appear so to a reasonable man in the surrounding circumstances; (c) "surrounding circumstances" in itself is vague.

### (a)

Appellants ask: "Did the legislature intend to exclude persons from aimlessly meandering in a park? That is what parks are for, yet it is a strange lexicon in which 'business' includes its antithesis, 'idling.' Is a person engaged in 'business' if he enters an art museum not to look at the paintings, but to get out of the rain, use the toilet,

or keep a tryst? Is a student engaged in 'business' if he enters a University physics building to discuss sports, sex or politics with a professor or another student?" We agree that the legislature did not intend "to sterilize public space by limiting its use to 'business' in the conventional sense of that term," and it is correct that "if an esoteric meaning was intended, it is not stated in the statute." But we think, as the United States District Court for the District of Maryland thought in *Dunkel v. Elkins, et al.,* 325 F. Supp. 1235 (Md.), in considering the constitutionality of the phrase "lawful business" within the contemplation of Code, Art. 27, § 577 B concerning trespass upon grounds of the University of Maryland, State colleges, community colleges, or any public school, that any constitutionally protected activity is a "lawful business" within the meaning of the statute. Although § 577 A (1) does not define what activities are constitutionally protected, the range of uncertainty inherent in the language is not such as would "broadly stifle fundamental personal liberties when the end can be more narrowly achieved." *Aptheker v. Secretary of State,* 378 U. S. 500, 508, quoting *Shelton v. Tucker,* 364 U. S. 479, 488. We do not believe that the phrase "lawful business" is so unprecise and has so uncertain a meaning that it fails to inform a defendant of the charge against him. We find that the statute does not offend the Due Process Clause of the Constitution because of it.

### (b) and (c)

Appellants argue that "[t]he situation is made much worse by the fact that the test is not whether the accused actually had 'lawful business' but whether it would appear so to a reasonable man," and, they add, the reference to "surrounding circumstances" introduces still another element of vagueness.

As we construe the statute an authorized employee may properly request a person to leave a public building during those hours of the day or night when it is regularly closed to the public if the surrounding circumstances are such as to indicate to a reasonable man that

the person has no apparent lawful business to pursue. This "lawful business" clause is a requirement for the notice rather than for the guilt of the offense. In other words, although an effective notice may be given if the surrounding circumstances are such as to indicate to a reasonable man that the person notified had no apparent lawful business to pursue, the criterion for guilt upon failure to obey the notice is that the person in fact had no lawful business to pursue. This construction obviates the absurd result that a person shown to have actual business to pursue could be convicted of the offense because the surrounding circumstances at the time of the notice were such as to indicate to a reasonable man that he apparently did not. We find the clear legislative intent to be that guilt be predicated not on apparent but actual lack of lawful business. The title to ch. 552, Acts 1966, which added the new § 577A to Art. 27 under the subtitle "Trespass", stated, *inter alia,* that it was "* * * providing that any person, *not having lawful business therein * * * who refuses or fails to leave a public building * * * upon being requested to do so by an authorized employee * * * shall be guilty of a misdemeanor, * * *."* (emphasis added). Thus the legislative intent was to preserve the security of the places designated, during hours when they are regularly closed, against individuals who remain there after notice, without any lawful purpose. So construed the statute clearly sets forth the type of conduct which is forbidden and specifically describes the nature of the required warning to leave. This construction also answers appellants' argument that the "unreasonable man" standard is acceptable in tort law but is repugnant to a clear definition of prohibited conduct, citing *United States v. Cohen Grocery Co.,* 255 U. S. 81, for we have found that the "unreasonable man" standard applies to the notice, much as it applies to probable cause to arrest, and not to the prohibited conduct. The statute declared unconstitutionally vague in *Cohen* made it unlawful to charge an unreasonable rate in handling or dealing in necessaries so as to

leave open "* * * the widest conceivable inquiry" and to forbid "* * * no specific or definite act." At 89. Unlike the statute before us, "unreasonable" related to the prohibited act, but we do not find, in any event, that *Cohen* established, as appellants claim, "that the tort test of 'reasonableness' is too indefinite for penal legislation. See Amsterdam, *The Void-for-Vagueness Doctrine,* 109 U.P.L.Rev. 67 (1960), note 139 at 93. In *Adderley v. Florida,* 385 U. S. 39, the Court held constitutional a statute which made a crime of "trespass with a malicious and mischievous intent." It felt that this phrase narrowed the scope of the offense rather than broadening it, and found that "there is no lack of notice in this law [Fla. Stat. § 821.18 (1965)], nothing to entrap or fool the unwary." At 42. It would seem that a statute is not unconstitutionally vague as too broad and all embracing if it prescribes a specific type of conduct and we think that § 577A (1) does so. Compare *Edwards v. South Carolina,* 372 U. S. 229, distinguished in *Adderley.*

Appellants seek to equate the statute here with anti-loitering statutes, making criminal such conduct as "loitering", "loafing", "having no visible means of support", and "not giving a good account of himself." They cite a number of cases in which such statutes have been held to be unconstitutionally vague. We do not feel that the statute here is comparable to anti-loitering statutes. Section 602 (o) of the California Penal Code contains language identical to that in the statute before us:

> "Refusing or failing to leave a public building of a public agency during those hours of the day or night when the building is regularly closed to the public upon being requested to do so by a regularly employed guard, watchman, or custodian of the public agency owning or maintaining the building or property, if the surrounding circumstances are such as to indicate to a reasonable man that such person has no apparent lawful business to pursue; is guilty of a misdemeanor."

The District Court of Appeal of California, holding in *In Re Bacon,* 49 Cal. Reptr. 322 that the statute was constitutional said, at 334-335: "Section 602, subdivision (o), is simply a trespass law intended to preserve the security of public buildings during hours when such buildings are regularly closed against individuals who remain therein without any lawful purpose." See also *Parrish v. Municipal Court,* 65 Cal. Reptr. 862 (1968). The rationale upon which the various anti-loitering statutes were voided is not apposite to the statute here which is a trespass statute with notice, clearly setting out the type of conduct forbidden and specifically describing the nature of the required warning to leave. By its terms it is aimed at conduct of one limited kind which it understandably and clearly spells out.

We find that the conduct which Code, Art. 27, § 577A (1) forbids is not expressed in terms so vague that men of common intelligence must necessarily guess at their meaning and differ as to their application. We hold that the statute does not violate due process of law for vagueness.

## II

On the premise that Art. 27, § 577A is an anti-loitering, anti-idling measure aimed at people who appear not to have lawful business, appellants contend that it denies due process and legal protection "because it is an unwarranted and irrational interference with the personal liberty to idle." The statute is codified under the subtitle "Trespass" and we have found that it is simply a trespass upon notice law. It is not within the category of the anti-loitering statutes and its provisions are not comparable to such statutes. It does not prohibit idling or loitering per se in public places but intends to preserve the security of public buildings under designated conditions. We do not agree that to do so interferes with the exercise of personal freedom without serving a legitimate public interest. It is not necessary to discard common sense to adhere to constitutional rights. No right to idle is unconstitutionally limited by forbidding presence

in a public building after due notice at such hours when the building is regularly closed to the public to those who have no lawful purpose to pursue there. In such circumstances there is no constitutional right to loiter in the building. We do not think that the statute invites arbitrary enforcement nor does it make selective enforcement inevitable.

## III

Appellants claim the equal protection clause in its function of precluding irrational discrimination as between persons or groups of persons in the incidence of a law is violated by the statute. We agree that the essential purpose of the statute is to permit the exclusion of potential trouble makers from public facilities, but we point out that they may be excluded only on specific conditions. The contention that the statute irrationally classifies idlers as potential trouble makers so as to be a denial of equal protection is answered in II *supra*. Appellants set out other classifications established by the statute which they claim are irrational.

a) Appearance in Lieu of Reality

This argument is based on the assertion that the statute "punishes not the person who *actually* has no lawful business on public space, but only the one who *appears* to have no such business." We have construed the statute as punishing only the one who *actually* has no lawful business there.

b) Discrimination Because of Personal Appearance

Appellants say the statute "permits and encourages the exclusion of persons from public space because of their personal appearance — because they have long hair or dark skins, wear peace buttons, or are poorly attired." They conclude that the State violates equal protection when it makes criminality depend on personal appearance. The answer is that the statute here does not do this. If a person has lawful business to pursue he has not

committed the offense proscribed regardless of his physical appearance or attire.

c) Discrimination at an Employee's Whim

Appellants urge: "The equal protection defects of § 577A are increased, not eliminated, by the fact that criminality thereunder also depends on a refusal to leave at the request of an authorized employee. The statute prescribes no standards for the authorized employee. He is free to pick and choose, for no reason or for a bad reason (such as skin color), which apparent idlers may remain on public property." The answer is that the premise of the argument is again incorrect. Request to leave is not at the whim of an authorized employee. First, it may be made only "during those hours of the day or night when the building, grounds, or specific portion thereof, is regularly closed to the public." Second, the test for the propriety of the request is not subjective but objective. It is not whether an individual employee felt that the person has no apparent lawful business to pursue nor is it whether the person asked to leave thought he had lawful business to pursue. Rather it is whether the surrounding circumstances were such as to indicate to a reasonable man that such person had no apparent lawful business to pursue at such place.

This argument as advanced by appellants has been regularly presented in cases involving vagrancy or anti-loitering statutes, e.g. *Smith v. Hill*, 285 F. Supp. 556 (E.D.N.C. 1968). In general the cases relied on by appellants, while reversing convictions for refusal to leave a public place upon order of a public official, were decided on the ground that the order violated a constitutional right to remain which was clearly possessed by the accused. So in *Wright v. Georgia*, 373 U. S. 284 the black petitioners were convicted of breach of the peace for playing basketball in a park because it was customarily reserved for whites. And in *Brown v. Louisiana*, 383 U. S. 131 blacks refused to leave a public library where whites were welcome. So in such cases equal pro-

tection was denied because the accused were ordered from a place where they had a right to be, while others were arbitrarily allowed to remain. But in the statute here any person may properly remain if he has a lawful purpose; only those with no lawful purpose to pursue may not remain and be punished for refusing or failing to leave.

"[O]f course statutes should be construed whenever possible so as to uphold their constitutionality." *United States v. Vuitch,* 402 U. S. 62, 9 Cr L 3071, 3073, decided 21 April 1971. "It is accepted that the Court should not strike down a statute as unconstitutional unless it violates the Constitution unmistakably. * * * Consequently, where there is any doubt of the validity of a statute, the Court will resolve the doubt in favor of the interpretation that will reconcile it with lawful limitations of legislative power." *Heslop v. State,* 202 Md. 123, 130. (citations omitted) We hold that Code, Art. 27, § 577A (1) is constitutional on its face.

## THE WARRANTS

The warrant [2] in each case read, in pertinent part, substantially that the accused:

> "on the 24th day of March 1970, at Prince George's County, Maryland, did unlawfully violate Article 27, Section 577A, of the Annotated Code of Maryland, 1957 Edition, to wit: did refuse to leave the Skinner Bldg., a public bldg. at Maryland University, College Park, P.G. Co., Md., to wit: after the said bldg. was closed to the public contrary to the form of the Act of Assembly in such case made and provided, and against the peace, government and dignity of the State."

---

2. A trial for a criminal offense shall be held only on indictment. Maryland Rule 703. Indictment shall include a warrant issued by a justice of the peace where a jury trial was prayed before a trial magistrate. Rule 702 a.

Each appellant contends that the warrant charging him is defective in that it does not charge an offense and is not sufficiently informative. "It has been stated that the purpose of a criminal charge — be it a state warrant, an information or an indictment — is twofold, that is, the charge must so characterize the crime and describe the particular offense 'as to put the accused on notice of what he is called upon to defend and to prevent a future prosecution for the same offense.'" *Lank v. State,* 219 Md. 433, 436. See *Weddle v. State,* 4 Md. App. 85, 92. Each indictment here fulfilled this twofold purpose. It informed the accused that he violated a specific law, "Article 27, Section 577A of the Annotated Code of Maryland, 1957 Edition," and additional language in the warrant with respect to the public building being closed to the public narrowed the charge to subsection (1) of § 577A. An offense was clearly charged, for unlike *Baker v. State,* 6 Md. App. 148, the law alleged to be violated was here expressly designated and by so doing the language of the statute was incorporated in the warrant by reference. The accused was fully on notice of what he was called upon to defend and if he were again charged with the offense that he was being twice placed in jeopardy would be readily apparent. In any event "[t]he rule which seems to be generally recognized draws a line of demarcation between an indictment or information [or warrant] which completely fails to state an offense and one which alleges all the elements of the offense intended to be charged and apprises the accused of the nature and cause of the accusation against him, even though it is defective in its allegations or is so inartfully drawn that it would be open to attack in the trial court." *Ward v. State,* 9 Md. App. 583, 587. We find that each warrant was sufficient to charge an offense.

We also find that each warrant was sufficiently informative as reasonably to put the accused on notice of the particular act violating § 577A, "to wit: did refuse to leave the Skinner Bldg., a public bldg. at Maryland University, College Park, P.G.Co., Md., to wit: after the said

bldg. was closed to the public." The hour of refusal to leave, the identification of the authorized official who requested the accused to leave, and a description of the surrounding circumstances existing when the request was made may have been matters of proof at the trial, but were not essential to the validity of the warrant. And we note that each accused could have moved for a bill of particulars under Rule 715 if he desired additional information with respect to the charge.

We hold that the lower court did not err in denying motions to dismiss the warrants.

## THE INSTRUCTIONS

Appellants claim prejudicial error in the court's instructions with respect to reasonable doubt and the burden of proof. After discussing the presumption of innocence and the consideration by the jury of the evidence, the court advised the jury:

> "Then the presumption of innocence leaves the defendant when you are satisfied in your mind that the defendant is guilty beyond reasonable doubt of each and every element of the crime as charged.
>
> Now, when I say 'beyond a reasonable doubt' I don't mean beyond a suspicion or beyond any doubt or any flimsy reasoning of doubt, I mean a doubt that is based upon reason. As an example, when you deal with the more important events in your life such as giving birth to a child, getting married, christening a child, buying a home, entering a business, going to college — these are big and important events in your life. And during the consummation of one of these events if anything should come to your mind or is brought to your attention that would cause you to pause or hesitate before you went forward and make you drag your feet, in other words, if you got to the altar and you said no,

then you would have a reasonable doubt. That is a doubt that is based upon reason because it is a doubt that is based upon reason and the doubt is formed by a quality of thought and subject matter. It is not a trivial matter such as paying an oil bill or an automobile accident or something like that, it is a vital thing. If you have a doubt that is based on that reason, that degree of reasoning, then it is your duty to acquit. On the other hand, if after considering the testimony of both sides you are convinced in your mind beyond a reasonable doubt, that is, the scales of justice have started downwards and met an even plateau and then they sink to the left in favor of the State, the State has proven a greater degree, then they have overcome that reasonable doubt and then you have likewise the duty and obligation to convict, as you may so find from the evidence. That is entirely your function. Of course, it must be a unanimous verdict of all twelve of you.

I advise you, of course, that this is a very important case, as you know. It affects the lives of many young children. But you are to apply the law without sympathy, apply it as you see it to the facts as they have been developed. If you have been satisfied beyond a reasonable doubt the defendants are guilty of one count of these three counts then you will return a verdict of guilty. If you are not so satisfied then you shall likewise return a verdict of not guilty."

Appellants objected to the "vital" language of the charge, Rule 756 f, but not to the "scales" language. However, they suggest that we take cognizance of the latter as plain error material to their rights. Rule 756 g.

As to the first alleged error appellants construe the court's remarks as "unmistakedly" instructing the jury that "one can have a reasonable doubt only if the sub-

ject matter is 'vital'—like marriage — and not if it is 'trivial'—like an automobile accident." They conclude: "If the jury thought, as well it might, that the sit-in at the Skinner Building was more classifiable as a 'trivial' matter like an automobile accident than as a 'vital matter' like saying 'No' at the altar, it would not be able, under the trial court's instruction to have a reasonable doubt." It seems that the jury were not inexperienced. The court observed in its charge, "Of course you know by now, as rather experienced jurors, that the Constitution of Maryland provides that the jury in a criminal case are judges of both the facts and the law * * *." We do not believe that the jury was misled by the challenged instruction, particularly when the instructions are considered as a whole. The court was not defining reasonable doubt, it was attempting to explain it. Opinion has been expressed that "the English language is not adequate to give a specific definition of 'reasonable doubt' that would simplify its meaning, for the rule requiring that the jury must be satisfied beyond a reasonable doubt is generally as simple and intelligible as a guide for the jury as any rule that could be formulated." *Lambert v. State*, 193 Md. 551, 559. The Court held in *Lambert* that "after the judge in a criminal trial instructs the jury that the State must prove the charge beyond a reasonable doubt in order to convict, it is not erroneous to instruct the jury that evidence is sufficient to remove a reasonable doubt when it convinces the judgment of an ordinarily prudent man of the truth of a proposition with such force that he would act upon that conviction without hesitation in his own most important affairs." At 560. In *Thompson v. State*, 4 Md. App. 31 we approved a charge which explained that evidence sufficient to establish a fact beyond a reasonable doubt means "such evidence as you would act upon in a matter involving important affairs in your life or in your own business or with regard to your own property. Now if the evidence is such that you would act upon it in very important matters in your own life then it is sufficient to convict in a

criminal case." At 35. We feel that the instructions here in effect explained reasonable doubt in terms of very important matters in the jurors' lives. It may be that more apt illustrations could have been used but we do not think that the jury was confused thereby. We find no prejudicial error.

Appellants construe the "scales of justice" part of the charge as advising the jury that they might convict on a preponderance of the evidence. Rule 756 g clearly spells out that on appeal a party may not assign an error in the instructions as of right unless (1) the particular portion of the instructions given was distinctly objected to before the jury retired to consider its verdict and (2) the grounds of objection were stated at the time. Ordinarily, states the Rule, no other error will be considered by the appellate court. The reason for the Rule as a prerequisite to appellate review is a salutary one, being designed to afford the trial court an opportunity to correct inaccuracies in its instructions. *Parker v. State,* 4 Md. App. 62; *White v. State,* 8 Md. App. 51. If trial counsel here felt that this part of the charge needed correction or amplification they could have called it to the court's attention. Apparently they did not think that it did, for no objection was made. But now we are asked to consider that portion of the charge to have been clear error, even though competent and experienced counsel at the time did not so consider it, and to correct it as material to appellants' rights. The language now challenged may not be isolated from the other explanations of reasonable doubt given by the court. What the charge in its entirety conveyed to the jury was that at first the scales dip in favor of the accused by the presumption of his innocence. Then as the prosecution adduces relevant and material evidence found credible by the jury they incline in favor of the State, reach an even balance and finally pass that balance on the State's side. When they have reached the point of proof beyond a reasonable doubt, the evidence is sufficient to convict. We do not endorse the language used but we cannot say that on the

instructions given the jury clearly could convict on a preponderance of the evidence. We find no clear error of which to take cognizance.

## THE SUFFICIENCY OF THE EVIDENCE

We have determined that the statute prescribing the offense charged was constitutional on its face, that the warrants on which appellants came to trial were valid and that the cases were submitted to the jury without prejudicial instructions. We now turn to questions presented as to the sufficiency of the evidence, before us on the denial of motions for judgment of acquittal made at the close of all the evidence. See *Williams v. State,* 5 Md. App. 450. The questions go to the sufficiency of the evidence in two areas only: (1) with regard to refusal or failure to leave the public building, and (2) with regard to having lawful business to pursue in the building.

### (1)

Four of the appellants, Marylyn Ann Kray and David J. Loomis, by their own testimony, and Stephen G. Berk and Charles H. Kennedy, by testimony of police officers who arrested them, were shown to have failed to leave the public building after a request to leave and they so concede in the brief. Edward Richard Guthrie and Paul Lester Woomer claim that there was no evidence to show that they had ever been in the building "much less that they had refused to leave the building." Each of the remaining fifty-three appellants [3] state in the brief that "the evidence shows that he was present when the warnings to leave were given" but claims that it did not show he refused to leave.

The building involved was the Skinner Building on the campus of the University of Maryland at College Park. It is owned by the Board of Regents of the University, a State instrumentality. The lower floor contains classrooms and offices of the departments of Philosophy and

---

3. See Appendix A listing the names of those who were convicted and appealed.

General Education. Laboratories of the Microbiology Department are on the second floor. The central telephone equipment for the entire University and an auditorium are in the basement. The University General and Academic Regulations for 1969-1970 provide:

> "UNAUTHORIZED USE OF BUILDINGS — except for properly scheduled classes or meetings, classroom, administration, and recreation buildings are closed to general student use on holidays, Saturday afternoons, Sundays, and after 8:00 P.M. during the week. Individual students may use these buildings or facilities with written permission from a member of the faculty or the administrative staff."

However, in practice, classes were at times held until 10:30 P.M. and administrative personnel usually closed classroom buildings at 11:00 P.M.

The events of 23 March 1970 and the early morning hours of the next day were the culmination of a controversy which arose over the Philosophy Department's refusal to grant tenure to two philosophy professors. Some students at the University met with the Student-Faculty Advisory Board and it was decided that a report of that discussion would be given to the general student body at an open meeting at noon on 23 March in the Skinner Building auditorium. The faculty of the Philosophy Department recommended to Dr. Walter Waetzen, Vice President for Administrative Affairs at the University, that there be no termination time set for the meeting, that philosophy classes for that afternoon be cancelled, that after the meeting philosophy faculty members would be available in their offices to talk to the students, that if the students "occupied" the building they would be urged to leave, but if they persisted they would be allowed to remain indefinitely. Dr. Waetzen would not agree that the students be permitted to remain in the building beyond the normal hours of business. They could stay until 11:00 P.M. and possibly longer if at that time,

in appellants' words, "a meaningful discussion in a structured situation was being conducted between the students and faculty." The final determination on whether this condition was met would rest with the University administrators.

The meeting of 23 March was well publicized and attended by about 700 persons. It broke up about 2:30 or 3:00 P.M. Some of the students went to the lobby and hallways of the building and others visited faculty offices. Dr. Waetzen, after consulting with various advisors and University Vice Presidents, determined to close the building at 11:00 P.M.[4] although he offered to permit fifty students to remain in the auditorium all night. The offer was rejected by the students. Dr. Waetzen called the State Police and about 2:30 A.M. on 24 March decided the building would be evacuated with the help of the police. About 3:20 A.M. Jerald L. Witsil, Superintendent of Public Safety at the University, Colonel Thomas Smith of the Maryland State Police and a State police detachment went to the Skinner Building. Witsil told those on the steps outside the building that it was closed for the night and read them subsection (1) § 577A of Art. 27. Witsil and the police then entered the building. In the lobby Witsil, identifying himself, stated, by means of a portable amplifier, that the building was closed and those who failed to leave would be arrested. He again read Art. 27, § 577A (1). Some dozen persons left. Col. Smith repeated the request to leave and gave those remaining five minutes to leave. Except for members of the press, faculty and administrators who were pointed out to the police by Witsil, those who remained at the expiration

---

4. Dr. Walter Schlaretzki, Chairman of the Philosophy Department, reported that "useful dialogue" ended about 8:00 P.M. There was also evidence from some defendants and witnesses that "meaningful dialogue" continued until the arrests early the next morning. On the other hand there was evidence of obscene gestures to the police and administrative personnel and cries of "Fascist pig, go home," "Fuck yourselves," and "Pigs" when the police arrived. There were signs and posters to the effect that the building was occupied and that those there intended to remain.

of the five minutes were arrested. They were transported to the Hyattsville Police Station.

It is clear that each of appellants were arrested after the five minute warning. It is also clear that Kray, Loomis, Berk and Kennedy were arrested in the building. The question is where were each of the remaining fifty-five appellants arrested, for if they were not arrested in the building but someplace outside it, it would be apparent that they had not refused or failed to comply with the terms of the request.[5] Witsil described the arrest procedure as he saw it. "I observed the individuals not leaving the building; some were sitting, some were standing. The State Police then began their arrest procedures. Officers came in and arrested two or three individuals per officer and escorted them out of the building." All the arrests were made by individual officers of the Maryland State Police. Fifteen Troopers testified on behalf of the prosecution.

Robert Spickler arrested three persons, Brandman, Weisbord and Chailet. "Once they were placed under arrest they were taken out and put into paddy wagons and were taken from there down to the Hyattsville station, County police station. We then went back and dispersed the crowd outside." About 5:00 A.M. he returned to the police station and processed the arrestees "which necessitated fingerprints, photographs, and we secured trespass warrants at that time, swore to the warrants, and read the warrants to them, and the arresting officer's picture along with the defendants was taken at that time." In answer to a specific question by the court he said that he was the officer who arrested the three people appearing with him in a photograph admitted as State's Exhibit 28. The three were Brandman, Weisbord and Chailet.

---

5. Witsil testified as to the terms of the request: "I advised them of my identity; that the building was closed for the evening; that to remain there would put them in jeopardy of being arrested; I read the section of the Maryland Annotated Code, Art. 27, Section 577A, the first paragraph which deals with during normal closing hours of a public building; and then at the conclusion of that I announced if they did not leave, they would be arrested."

Donald R. Bartgis testified that he arrested five students who were inside the building, Paula Rae Katz, Howard Leibowitz, Lawrence Babits, Susan E. Reynolds,[6] and Sheila Zubrod. On cross-examination it was elicited that while he had escorted five persons from Skinner Hall to the police van he could not say that Katz, Leibowitz, Babits, Reynolds and Zubrod were among them. In his words, "the actual arrests [of these five] were effected at the Prince George's County Police Station."

Fred Ashley Settle testified that he arrested six persons, Nancy Beth McKowsky, Francis W. Horle, Patricia Ann McDonald, Charles Ernest Burt,[7] "a Sadeno subject who was charged with another offense," and a juvenile. On cross-examination he was unable to say who he had arrested at Skinner Hall so that he could not identify those photographed with him at the police station and those named in the warrant he swore out as those he had taken into custody in the college building.

Fred D. Detrow testified that he arrested four persons in the building, Donald James Danneman, William Joseph Riegger and Earle Francis Young, III, and a Mr. Sadano.[8] They were transported in groups "by members of our staff and some members of the college police" to the Hyattsville Station. On cross-examination, however, it became clear that he did not know whether Danneman, Riegger and Young with whom he was photographed at the police station, and who were named in the warrant he swore out, were arrested by him at the building. There was no time to take their names at the time of the arrest at the Skinner Building and they were placed in the vans with the rest of the group. They were three of those he was told had been arrested at the scene. He was "not familiar with how they were assigned [at the Station]. I think they were just taken at random * * *." But there was no doubt in his mind that the per-

---

6. Miss Reynolds did not appeal. See Appendix B.
7. Burt did not appeal.
8. Young and Sadano were not defendants at the trial.

sons processed at the Station had been arrested in Skinner Hall. When the arrests were made in the building the arrestees were escorted by the arresting officer "most of the way" to the vans which were backed up as near as possible to the entrance of the building. "There were lines with policemen on either side to prevent their escape." When he placed an arrestee in a line for the van, he left. "My job was to escort students out."

E. D. Selby took six persons who were in the building into custody, Stephen Berk, John Harold Meier, Robert Phelps Wade, Jr., Lawrence Dean, Timothy Arnold and Robert Ferraro.[9] Selby said he had assisted Detrow in the removal of Berk from the building. As to the other five, he could not say that any of them were among those he had taken into custody at the building but he had processed them at the police station.

C. A. Scott was one of the Troopers who removed people from Skinner Hall. He removed "approximately three or four." At the police station he "arrested" Robert Earl Clapp, III, Donald Louis Miller and Peter Joseph Lowry and processed them. It seemed apparent from his testimony on cross-examination that he did not know whether the three he processed were among the three or four he had escorted from the building and it was clear that they were not necessarily among them.

When the prosecutor called Joseph Marik to testify he attempted "to shorten this procedure up." He did so by avoiding reference to any participation of Marik in the proceedings at Skinner Hall. He adduced only that Marik had Ann Gordon, Michael Perri, Phillip Lavery, Lawrence Schofman, Raymond Thomas and Richard Robinson[10] placed in his custody at the police station and processed them. On cross-examination when Marik was asked if any of those placed in his custody at the station were among those he took from Skinner Hall earlier, the State objected on the ground there had been no testi-

---

9. Meier, Wade and Ferraro did not appeal.
10. Robinson does not appear as one of the defendants at the trial.

mony that he had removed anyone from the building and the objection was sustained. He later said that he could not "specifically remember on an individual basis" if he had seen them earlier in the evening.

The activities of Frederick L. Yeager on the morning of 24 March were also picked up by the State from the time he arrived at the Hyattsville Police Station. He had eight "defendants turned over to him," Frederick T. Brown, John P. Sullivan, Joseph Densford, Michael F. Jackson, Douglas E. MacAdams, Terence McKean, Bailey Sterrett, III, and Robert C. Westbrook.[11] He processed them. On cross-examination he said he took no one from the Skinner Building.

James R. McDonald had eight people placed in his custody at the police station. He was "responsible for" Edgar Fred Beall, George Duffy French, David Bryan Binder, Richard Edward Guthrie,[12] Stuart H. Levine, Bryan David Mitnick,[13] Claude Marc Watsky, and Marc Joseph Rooney. McDonald said he had two contacts with them, "Once at the Skinner Building and then again at the Hyattsville Police Station," but they were not under his control from the Skinner Building to the police station. On cross-examination he said he arrested eight persons in the Skinner Building.

Donald Harding testified that he had Charles Lee, David Anderson, Donald Tiedeman, Barbara Myers, Joan MacQuarrie, and Crescent Christianson turned over to him at the police station.[14] On cross-examination he said he took only four persons out of the Skinner Building.

Ronald Herring testified that Lloyd Stanley Tenny, III, Gregory Conklin Hoke, Antonio Saraceno, Rosalie Angela Steel, Deborah Dwornik, and Mary Paige Prichard[15] were placed in his custody for purposes of pro-

---

11. Brown, Densford and Jackson did not appeal.
12. In the warrant the name is given as Edward Richard Guthrie.
13. Mitnick was acquitted. See Appendix C.
14. Tiedeman and Myers did not appeal. MacQuarrie was acquitted.
15. Dwornik was acquitted. Prichard did not appeal.

cessing. On cross-examination he said he made no arrests at the Skinner Building.

Bryan Hubble had Paul Lester Woomer, Vincent Genovese, Charles Irving Hughes, William J. Shickler, James Thomas Morely, and Pierre Edward Blum [16] turned over to him at the police station for processing. On cross-examination he said he did not arrest them at the Skinner Building but he did arrest six persons there for failing to leave the building after requested to do so.

William E. O'Hara was called to the police station "to effect arrests that had been made at Skinner Hall, University of Maryland, just a couple hours previously. * * * We effected the arrests at the Skinner Building * * *. However the processing was done approximately one to two hours later at the Court—jail * * * in * * * Hyattsville." He processed Stephen Schuman, Robert Brewer, John Butters, Alyn Levin, Deborah Cohen, and Marylyn Kray.[17] O'Hara had gone to the Skinner Building. His version of what occurred there was that "Colonel Smith made the arrest; he placed everybody under arrest. We, the officers, were under his order to effect the arrest, so to speak. So we escorted them to different vehicles that escorted them to jail." It did not appear that the six he processed were any of the six he escorted to the vehicles. At the building he just picked up any three to keep the line going.

Richard Eugene Cook was ordered to the Skinner Building and later to the Hyattsville police station where he processed Marc Lipnick, Lawrence Phillips, Anthony Padera, Leon Gubala, Ronald Rudin, and Lawrence Rosen.[18] On cross-examination he said he made arrests at the Skinner Building but when asked if any of those he processed were among those arrested, he replied: "Not that I remember, no, sir." He could not say that he saw them at the Skinner Building. "If I did, I don't remem-

---

16. Genovese was acquitted.
17. Schuman was acquitted. Brewer did not appeal.
18. Lipnick and Gubala were acquitted. Phillips and Padera did not appeal.

ber any of them." As to the arrests at the Skinner Building, "Colonel Smith made a statement to the effect that 'You have not left the building, do you want—I assume you want to be arrested' and the response was, 'yes.' I don't know who said yes or who didn't, but at that time he said, 'Arrest them,' and we did." For the processing there was "no prearrangement which officer would take any particular people." The arrestees were in a hallway and an officer just took three at a time.

John W. Reburn recounted what occurred at the Skinner Building. "I went to the University of Maryland campus because the students or persons had taken over one of the buildings on the campus, or were inside the building, and would not leave. We went there as a group in our tactical squad, and we were assigned to — our particular duty of my squad was to go to the — we were at the Skinner Building and we were to wait in front of the building, and our commander, Colonel Smith, went inside the building with someone from the College Park police department, I believe it was Mr. Witsil, and they informed the students that they were trespassing in the building. It was ₁a large group there in the lobby. They asked them to leave, and several got up and left and they read the trespass act or the order to them. He gave them a period of time to think it over, and they were requested to leave again. And I believe it was somewhere around approximately eight minutes of four he asked them again if they were going to stay, and told them that if they did stay, they would be arrested for trespassing. No one else got up and left, and Colonel Smith, then advised our squad to arrest the persons in the building for trespassing, and we did so. I went inside and took them by the arm and led several outside and placed them inside the Sheriff's Department's vehicles, and they were taken—were later taken to the Hyattsville station, where we went to the station and processed them." He processed Samuel Elliott Tucker, David John Wachter, Charles Hutton Kennedy, Stephen J. Goldner, Edward D. Goldberg, Stephen Kirby White, Craig Derek Williams,

David Jessup Loomis, and Charles Richard Roleofs.[19] Reburn personally took Kennedy from the building and "guided him by the arm to the Sheriff's Department's vehicles." On cross-examination he said that he had arrested only two of the nine at the Skinner Building.[20] Colonel Smith told the Troopers to arrest "each and every person in the building."

During the examination of Witsil he described what happened immediately after the request had been made of the people in Skinner Building to leave the building. Twelve or thirteen did leave. Those that remained "were in the lobby, again [sic], and the staircase area of the main floor of the building, the street level floor. Most were sitting down together in a group in the center, and a few were standing up against the wall or on the edge of the group." They were depicted in ten photographs received in evidence [21] on Witsil's testimony that they represented fairly and accurately what he observed in the lobby area of the Skinner Building when he entered it about 3:30 A.M. on 24 March. The photographer was Donald E. Robinson, chief photographer of the Maryland State Police. He went to the Skinner Building with Colonel Smith and Witsil. "Well, when we arrived there, there was students sitting inside the building on the floor, on the stairways, and Colonel Smith and Mr. Witsil went up to the door, went inside, I went with him, at which time Mr. Witsil read them the trespass law, and he gave them, I believe it was, five minutes to leave, and anybody within that five minutes that wanted to leave could get up and do so and they would not be bothered. He gave them like a countdown as to how long they had, and after the five minutes I believe it was, Colonel Smith

19. Goldberg and Williams did not appeal. Roleofs does not appear as a defendant at the trial.
20. The record does not show who the second person was. On redirect examination, he was asked if he recognized Reverend Loomis and said, "yes, sir. I did not look along the front room." He was then asked, "Is there anyone else in this courtroom that you recognize that maybe you yourself removed from the building?" and he replied, "Not right off."
21. State's exhibits 2 to 11, both inclusive.

said, 'Your time is now up. I understand the ones who
are here now wish to be arrested.' " [22] Robinson identi-
fied the photographs in evidence marked State's exhibits
2-11 as those he took on the morning of 24 March 1970
in the Skinner Building. He was asked when they were
taken. He said:

> "Well, I couldn't pick out any certain one as
> to which exact time it was taken, but they were
> taken from the time we went into the door, in-
> to the building, and Mr. Witsil was reading the
> trespass law, and from the time that they gave
> them, the five minutes to disperse, and they
> were taken all during that time, from the time
> that they actually made the arrest."

He explained that they were all taken after Witsil gave
them the trespass warning up to the moment of the ac-
tual arrest. Colonel Smith, testifying on behalf of the
State, was asked: "Do you recall in point of time within
the five minute period of your countdown when these
photographs [State's exhibits 2-11] were taken?" He an-
swered: "Well, I believe we went in that building ap-
proximately at sometime after three—20 minutes after
three, somewhere along in there, and in the time span
of five minutes, give or take a few minutes, those pic-
tures were being taken. And as the people were being
arrested some of them were taken."

The procedure followed by the State in presenting its
case was that each Trooper, after giving the names of
those he processed at the police station, was referred to
the photographs taken by Robinson of the lobby area.
The Trooper would then identify, if he could, the persons
he had processed who appeared in one or more of those
photographs. All except ten of the appellants were so
identified. The ten were Berk, Guthrie, Mitnick, Mac-
Quarrie, Dwornik, Woomer, Genovese, Schuman, Lipnick
and Gubala. Trooper Selby, however, identified Berk as

---

22. At this point there was objection by defense counsel "to what
he heard." It was sustained but there was no motion to strike.

the man he had helped Trooper Detrow escort from the building. Of the remaining nine all but Woomer and Guthrie were acquitted at the close of the evidence offered by the State on the State's concession that as to them "an identification has not been made at this time" and that it could not call any other witnesses to establish identity otherwise. The status of the evidence with respect to Woomer and Guthrie was the same as that with respect to the seven who were acquitted by the court and why they were not included at the time was not mentioned by the court, prosecution or defense.

It is obvious that the actual arrests of the 82 persons tried together took place at the University and not at the Hyattsville Police Station. When they were served with warrants at the station they were already in custody. And it is apparent that except by mere coincidence, as in the cases of Berk and Kennedy, a person arrested by an officer at the Skinner Building was not processed by the officer who arrested him, at least as far as that officer knew. So, say all the appellants except Berk and Kennedy, who were expressly identified as being arrested in the Skinner Building, and Loomis and Kray, who made a judicial admission of arrest in the building, the evidence is not sufficient to establish that we were arrested in the Skinner Building and that being so it is not sufficient to show that we refused or failed to leave the building after being requested to do so. They argue that their appearing in the photographs of the lobby area did not establish their presence after the five minute ultimatum because at least some of the photographs, and precisely which ones are unknown, were taken before or during the five minute warning.

We think that the question whether or not an appellant was arrested in the Skinner Building was properly for the jury. It is clear that the arrests were made after the five minute ultimatum. And it was the direct evidence of some of the arresting officers and a rational inference from the testimony of others that all the arrests of appellants were made in the Skinner Building. There

is no indication whatever that any were arrested outside the building. Thus Guthrie and Woomer could not be excluded, for regardless of whether or not they were shown to have appeared in one of the photographs, the jury could, and implicitly did, find that they were arrested in the Skinner Building. Because one or more defendants may have been improperly acquitted does not mean that the acquittal of others in like circumstance is compelled. Nor do we feel that such a finding was improper because the chain of custody of each appellant was not specifically traced from the time he was taken in custody at the Skinner Building to the time he was processed at the police station. The evidence was that a person was arrested, placed in a line guarded by police to prevent escape, so escorted into vehicles, and transported in those vehicles to the police station. Those at the police station were processed about an hour and a quarter thereafter. While a better procedure could have been followed by the police, we think that the evidence as to identification was sufficient in law and thus properly presented to the jury. Therefore the jury could have properly found from the evidence that since an appellant was arrested in the Skinner Building after the request to leave was made, he had refused or failed to leave within the contemplation of the statute.

### (2)

It was not whether Loomis or Kray or any of the other appellants thought they were engaged in "meaningful discussion" that was determinative of whether they had lawful business to pursue in the Skinner Building. The University Administrators indicated that students could possibly stay after 11:00 P.M. if "a meaningful discussion in a structured situation was being conducted between the students and the faculty" but the final determination on whether this condition was met was in the Administrators. It is patent that when they decided to declare the building closed and request those in it to leave that they had determined that the condition was no

longer being met.[23] On the evidence adduced it was properly a jury question whether or not each appellant had lawful business to pursue in the Skinner Building when he was requested to leave. We think that the evidence in law was sufficient for the jury to find that none of the appellants had lawful business to pursue at the time of arrest.

We hold that the trial court did not err in denying the motion for judgment of acquittal made by each appellant.

## THE APPLICATION OF THE STATUTE

Appellants' contention that the statute was unconstitutionally applied is predicated upon the rule that if it is unconstitutionally vague on its face, it is wholly void and cannot be preserved for some applications. See *Lanzetta v. New Jersey,* 306 U. S. 451. This contention falls on our finding that the statute was valid on its face. Of course, even a constitutional statute may be unconstitutionally applied. See *Shuttlesworth v. City of Birmingham,* 382 U. S. 87, 91. But we see no unconstitutional application here. The Skinner Building was certainly regularly closed at 3:30 A.M. The applicable law was read. A request to leave was made by an authorized employee, at a time when the surrounding circumstances were such as to indicate to a reasonable man that those in the building had no apparent lawful business to pursue there. Colonel Smith testified:

> "I asked those assembled if they would care to leave. I said if they did not leave we would have to make arrests. A few people got up and moved out. I again requested that those who

---

23. The decision to close and evacuate the building was made about 11:30 P.M. Dr. Waetzen, Vice-president for Administrative Affairs at the University testified that of concern to the Administration was that "our whole telephone switchboarding equipment" was in the building. They were also concerned about a $50,000 electron microscope in the microbiology department, and about many bacterial cultures in that department which "are potentially harmful to human beings."

did not want to be arrested leave, and at this time no particular movement was discerned. And then I said, 'We will give you five minutes to make up your minds. Now all of you who remain will be arrested.' There would be no doubt about it. 'We are going to arrest everybody who remains here who is not supposed to be in here.' I watched my watch, and at four —after one minute had transpired, I called out a time, 'Now we have four minutes to go, how about leaving?' And three minutes and two minutes and one minute, then I said, 'Time is up. Now, we don't want to arrest you, we would prefer you to leave. Will you please leave?' No movement. And I said, 'Well, if this is the case, all those of you must want to be arrested.' And we still had no movement, and I then directed my men to come in and start making arrests."

We hold that there was nothing unconstitutional in the manner in which the statute was applied.

*Judgments affirmed; appellants to pay costs.*

## APPENDIX A

*Those defendants who were found guilty and perfected an appeal.*

| CRIMINAL APPEALS NUMBER | DEFENDANT'S NAME |
| --- | --- |
| 13,699 | David Arthur Anderson |
| 13,700 | Timothy D. Arnold |
| 13,701 | Lawrence E. Babits |
| 13,702 | Edgar Fred Beall |
| 13,703 | Stephen G. Berk |
| 13,704 | David B. Binder |
| 13,705 | Pierre E. Blum |
| 13,708 | Crescent L. Christianson |
| 13,709 | Robert E. Clapp, III |

| | |
|---|---|
| 13,710 | Deborah E. Cohen |
| 13,711 | Donald J. Danneman |
| 13,712 | Lawrence G. Dean |
| 13,717 | Stephen J. Goldner |
| 13,719 | Edward Richard Guthrie |
| 13,720 | Gregory Conklin Hoke |
| 13,721 | Frances W. Horle |
| 13,722 | Charles I. Hughes |
| 13,724 | Paula Rae Katz |
| 13,725 | Charles H. Kennedy |
| 13,726 | Marylyn Ann Kray |
| 13,727 | Phillip P. Lavery |
| 13,728 | Charles R. Lee |
| 13,729 | Howard S. Leibowitz |
| 13,730 | Alyn H. Levin |
| 13,731 | Stuart H. Levine |
| 13,733 | David J. Loomis |
| 13,734 | Peter J. Lowry |
| 13,735 | Douglas E. MacAdams |
| 13,736 | Patricia A. McDonald |
| 13,737 | Terry M. McKeon |
| 13,739 | Donald L. Miller |
| 13,741 | James Thomas Morley |
| 13,743 | Michael W. Perri |
| 13,747 | William J. Riegger |
| 13,749 | Lawrence D. Rosen |
| 13,750 | Lawrence B. Schofman |
| 13,752 | Rosalie A. Steel |
| 13,753 | Bailey D. Sterrett, 3rd |
| 13,754 | John P. Sullivan |
| 13,772 | Richard Barry Brandman |
| 13,773 | John Robert Butters |
| 13,775 | Edward William Chailet |
| 13,777 | George Duffy French |
| 13,778 | Ann Erica Gordon |
| 13,779 | Nancy Beth McKowsky |
| 13,782 | Mark Joseph Rooney |

| | |
|---|---|
| 13,783 | Ronald J. Rudin |
| 13,784 | Antonio Saraceno |
| 13,785 | William J. Shickler, Jr. |
| 13,786 | Lloyd Stanley Tenny, 3rd |
| 13,788 | Raymond L. Thomas |
| 13,789 | Claude Marc Watsky |
| 13,791 | Samuel Elliott Tucker |
| 13,792 | David John Wachter |
| 13,793 | Wendy Joy Weisbord |
| 13,794 | Robert Charles Westbrook |
| 13,795 | Stephen Kirby White |
| 13,797 | Paul Lester Woomer |
| 13,799 | Sheila Sullivan Zubrod |

## APPENDIX B

*Those defendants who were found guilty but did not appeal.*

| CRIMINAL APPEALS NUMBER | DEFENDANT'S NAME |
|---|---|
| 13,706 | Robert N. Brewer |
| 13,707 | Frederick T. Brown |
| 13,713 | Joseph R. Densford |
| 13,714 | Robert J. Ferraro |
| 13,716 | Edward D. Goldberg |
| 13,723 | Michael F. Jackson |
| 13,738 | John H. Meier |
| 13,742 | Barbara Jean Myers |
| 13,744 | Lawrence J. Phillips |
| 13,745 | Mary Paige Prichard |
| 13,746 | Susan E. Reynolds |
| 13,774 | Charles Ernest Burt |
| 13,781 | Anthony Joseph Padua |
| 13,787 | Donald Roger Tiedeman |
| 13,790 | Robert Phelps Wade, Jr. |
| 13,796 | Craig Derek Williams |

## APPENDIX C

*Defendants acquitted at trial.*

| CRIMINAL APPEALS NUMBER | DEFENDANTS NAME |
|---|---|
| 13,740 | Bryan D. Mitnick |
| 13,780 | Joan Phillips MacQuarrie |
| 13,776 | Deborah Dwornik |
| 13,715 | Vincent M. Genovese |
| 13,732 | Marc I. Lipnick |
| 13,718 | Leon A. Gubala, Jr. |
| 13,751 | Stephen E. Schuman |