837 A.2d 248

Donta MORRIS

and

Gregory Everett

v.

STATE of Maryland.

No. 1302, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Dec. 4, 2003.

482

484

Brian J. Murphy, Michael R. Braudes (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Steven L. Holcomb (J. Joseph Curran, Jr., Att. Gen., on the brief), Baltimore, for appellee.

Argued before JAMES R. EYLER, ADKINS, and CHARLES E. MOYLAN, JR. (Retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge, Retired, Specially Assigned.

A Baltimore City jury, presided over by Judge Joseph P. McCurdy, Jr., convicted one of the appellants, Gregory Everett, of second-degree murder and an attendant handgun offense. Everett received consecutive sentences totaling 50 years. The same jury convicted the other appellant, Donta Morris, of first-degree assault and an attendant handgun offense. Morris received consecutive sentences totaling 45 years. On this joint appeal, both appellants raise the following five contentions:

1. That Judge McCurdy erroneously denied their pretrial motion to suppress six projectiles taken in a search of 1115 Abbott Court;

2. That Judge McCurdy erroneously denied their motions to strike prospective jurors for cause;

3. That Judge McCurdy erroneously admitted hearsay evidence;

4. That the court's instructions to the jury and the prosecutor's closing argument gave the jurors a mistaken understanding of the "beyond a reasonable doubt" burden of persuasion; and

5. That Judge McCurdy erroneously denied their motion to dismiss the charges because of a violation of Maryland Rule 4–271.

The appellant Morris alone raises yet a sixth contention:

6. That Judge McCurdy erroneously denied him the right to view certain exhibits that were shown to the jury.

## I. The Pretrial Motion to Suppress

The appellants' claim that Judge McCurdy erroneously denied their pretrial motion to suppress six projectiles recovered in the search of 1115 Abbott Court is two-pronged. One subcontention challenges the issuance of the warrant. The other challenges the execution of the warrant.

## A. Fine–Tuning the Standard of Appellate Review

It is a commonplace that, before arguing or before deciding a contention challenging the ruling of a suppression hearing, appellate lawyers and appellate opinion writers alike routinely recite a familiar paragraph about the standard of appellate review. The drill is so automatic that it has been reduced to a "scissors and paste" modality. As long as the ritualistic words have a respectable precedential pedigree, no one pauses to inquire what they actually mean or whether they actually make complete good sense.

Switching onto automatic pilot, the solemn incantation routinely begins, "We accept the facts as found by the hearing judge unless it is shown that those findings were clearly erroneous." *In Re Tariq A–R–Y,* 347 Md. 484, 489, 701 A.2d 691 (1997); *McMillian v. State,* 325 Md. 272, 281–82, 600 A.2d 430 (1992); *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239 (1990). Without a pause for breath, the ceremonial chant invariably continues, "We view the facts in the record in the light most favorable to the ... prevailing party on the motion." *State v. Green,* 375 Md. 595, 607, 826 A.2d 486 (2003); *Riddick v. State,* 319 Md. at 183, 571 A.2d 1239; *Cherry v. State,* 86 Md.App. 234, 237, 586 A.2d 70 (1991).

How often has an opinion suddenly stopped at that point and demanded, "Hey, wait a minute! Which one?" Boilerplate recitations can be a curse. Two rules of interpretation, of apparent equal dignity, have been announced; yet those rules may on occasion actually contradict each other. Except with respect to certain ultimate conclusory facts, an appellate court, of course, is never free to pick and choose the facts that it will consider. With respect to which lower-level, non-conclusory, constituent facts may enter into its ultimate reckoning, the appellate court is bound by rigid rules of interpretation, but which of those rigid rules is paramount?

What should the appellate court do, for instance, when a non-clearly-erroneous finding of fact by the hearing judge is something other than that version of the evidence most favorable to the prevailing party? Does deference to the judge's fact-finding "trump" the putting together of that version of the evidence most favorable to the prevailing party? Or does being in "the light most favorable to the prevailing party" outshine judicial fact-finding?

The choice of rules could be critical in a case in which the appellate court cannot affirm the suppression hearing ruling for the reason given by the trial judge but might be considering affirming it for a different reason, if the facts permitted to it for consideration could establish a *prima facie* case in support of an alternative rationale. The question might be whether the trial court, in following one path of reasoning, had

found facts that might preclude the appellate court from following a different path of reasoning to affirm the trial court. Both rules of interpretation, of course, are valid, and they do not necessarily contradict each other. To avoid the possibility of contradiction, however, we need to determine and to announce which rule is primary and which is only supplemental.

■ The most basic rule of appellate review of fact-finding is that of extending great deference to the fact finder, be it judge or jury. Appellate judges do not see or hear the witnesses or have the benefit of any sort of non-verbal communication. They are relatively far less able to assess credibility than are the fact finders on the scene. Appellate judges, moreover, are not immersed in the local context and do not get the sometimes inexpressible "feel" of the case. They are relatively far less able to weigh the evidence than are the fact finders on the scene. The basic rule of fact-finding review, therefore, is that the appellate court will defer to the fact-findings of trial judge or jury whenever there is some competent evidence which, if believed and given maximum weight, could support such findings of fact. That is the prime directive.

With respect to the review of a suppression hearing ruling, the problem is that sometimes the fact-finding of the trial judge may be ambiguous, and the appellate court may frequently find it necessary to resolve the ambiguity. It needs an interpretive rule for just such cases. Sometimes the fact-finding of the trial judge may be incomplete. The trial court may have found those facts important to it but have made no findings as to other facts, peripheral to it but perhaps important to the appellate court. Sometimes the hearing judge may simply have made a ruling on suppression without announcing any findings of fact. How then does the appellate court, in reviewing a suppression hearing ruling, fill those fact-finding gaps, partial or total? What does the appellate court do when there is no fact-finding, or incomplete fact-finding, to which to defer?

■ It is here that the supplemental rule of interpretation comes into play. In determining whether the evidence was

sufficient, as a matter of law, to support the ruling, the appellate court will accept that version of the evidence most favorable to the prevailing party. It will fully credit the prevailing party's witnesses and discredit the losing party's witnesses. It will give maximum weight to the prevailing party's evidence and little or no weight to the losing party's evidence. It will resolve ambiguities and draw inferences in favor of the prevailing party and against the losing party. It will perform the familiar function of deciding whether, as a matter of law, a *prima facie* case was established that could have supported the ruling.

This is, however, the supplemental rule that is only brought to bear on the record of the suppression hearing when the hearing judge's fact-finding itself is 1) ambiguous, 2) incomplete, or 3) non-existent. The supplemental rule guides the appellate court in resolving fact-finding ambiguities and in filling fact-finding gaps.

We tried to make this hierarchal distinction between the two standards of review in *Charity v. State,* 132 Md.App. 598, 606, 753 A.2d 556, *cert. denied,* 360 Md. 487, 759 A.2d 231 (2000), but somehow the non-discriminating incantations continue to drone on.

> *The* one *obvious qualification to* or modification of *a reviewing court's acceptance of the version of the evidence most favorable to the prevailing party,* of course, *is with respect to findings of first-level fact actually made by the hearing judge.* Except in rare cases of clear error, we give great deference to such findings of fact when actually made. *The actual findings of fact made by the hearing judge,* unless clearly erroneous,. *"trump" the version most favorable to the prevailing party* to the extent to which they might be in conflict.

(Emphasis supplied).

## B. The Issuance of the Warrant

■ The appellants contend that the facts contained in the application for the search warrant failed to establish the

probable cause necessary to justify its issuance. We do not agree. The application, in part, recited:

> During the course of investigating the crime scene, *a concerned citizen* approached police personnel and *advised that the suspect wanted in this incident was observed running into 1115 Abbott Court.*
>
> *The concerned citizen provided* investigators with *a physical description of the shooter,* in addition to *the location of a public dumpster where the shooter [was] observed discarding parts of his clothing.*

(Emphasis supplied).

The police conducted their own independent check of who lived at 1115 Abbott Court. The warrant application went on:

> A check of that address [1115 Abbott Court] revealed that the lessees of the address was in the name of Norma Jones. *Also residing at this address is a Gregory Everett Jr.* and Requell Jackson.

(Emphasis supplied). By way of further police corroboration of the "concerned citizen's" account, officers went to the dumpster in question and recovered male clothing.

The affidavit offered in support of the application further averred that other witnesses had been interviewed and that they identified Everett as the person they saw shoot and kill Antoine McRay. In this regard, the application alleged:

> Several witnesses to this incident were located and transported to the Homicide Unit and interviewed. As a result of these interviews a suspect profile was compiled and a photographic arrays developed. *These witnesses positively identified Gregory Everett as the person they observed shoot and kill Antoine McRay.*

(Emphasis supplied).

Before the warrant was obtained, a Baltimore Housing Authority Police Officer had already gone to 1115 Abbott Court to secure the premises. Four individuals were present at that address, including both Everett and Morris. They were taken to the police station and interviewed. No appel-

late contention has been raised with respect to that procedure. The application alleged:

> Units were dispatched to 1115 Abbott Court and to the dumpster identified by the concern[ed] citizen. 1115 Abbott was secured from the outside and the occupants removed from the location. *Located within the dwelling and transported to the Homicide Unit were Gregory Everett,* Ryan Robinson, Norman Harris *and Donta Morris.*

(Emphasis supplied).

In ruling that there was probable cause to support the issuance of the warrant, Judge McCurdy summarized the evidence establishing probable cause.

> She [the concerned citizen] provided the investigator with a physical description of the shooter. Now, it doesn't say what it was, but it says that she did describe the shooter and the location of a public dumpster where the shooter was observed discarding parts of his clothing. Units were dispatched to 1115 Abbott Court and the dumpster where, located inside the dumpster, was an article of male clothing which was recovered by the Crime Lab and submitted for evidence.

> So the probable cause that the police have for getting the warrant are the fact that the homicide was committed, the fact that the witness who was not identified by name but who was ultimately identified, gives a statement as to the description of the shooter and the place where the shooter ran, that she says that the shooter was observed—the person who she identified as the shooter was observed disposing of clothing in the dumpster, and that's the basis for probable cause.

We see no error in Judge McCurdy's ruling.

## C. The Execution of the Warrant

The appellants' second subcontention is that the police "jumped the gun" and searched for and seized the six cartridges from 1115 Abbott Court before they actually obtained the search warrant authorizing the search of that residence.

The claim is that the police, anachronistically, got the cart before the horse.

■ The search warrant was issued by Judge Bonita J. Dancy at sometime between 5 P.M. and 6 P.M. on July 10, 2001. The murder of Antoine McRay had occurred at approximately 1 P.M. that afternoon. Officer Alvin Barnes was one of the first investigators to arrive at the crime scene. It was he who was told by a "concerned citizen" that the shooters had run into 1115 Abbott Court.

At some time shortly thereafter, Officer Barnes, accompanied by Officer Anthony Grant, went to 1115 Abbott Court. They 1) entered 1115 Abbott Court; 2) requested both appellants and two other men to step outside; and 3) ultimately took all four men to the station house. According to the testimony of both officers, they did not at that time search 1115 Abbott Court or collect any evidence therefrom. Officer Grant testified that they entered the residence 1) to *secure* it, 2) to look around for people but for nothing else, and 3) to hold "the four men" outside pending the arrival of the "proper authorities."

■ Although the appellants make no issue of this, we note that, if an officer has probable cause to believe that a home contains evidence of crime and that the occupants, if left free of any restraint, might destroy the evidence, he is permitted to take reasonable steps to secure the residence and to hold the situation inviolate until a warrant to search the residence can be obtained. In *Segura v. United States*, 468 U.S. 796, 810, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), the Supreme Court held:

> [S]ecuring a dwelling, on the basis of probable cause, to prevent the destruction or removal of evidence while a search warrant is being sought is not itself an unreasonable seizure of either the dwelling or its contents.

The Supreme Court reached a similar conclusion in *Illinois v. McArthur*, 531 U.S. 326, 337, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001).

In sum, the police officers in this case had probable cause to believe that a home contained contraband, which was evidence of a crime. They reasonably believed that the home's resident, if left free of any restraint, would destroy that evidence. And they imposed a restraint that was both limited and tailored reasonably to secure law enforcement needs while protecting privacy interests. In our view, the restraint met the Fourth Amendment's demands.

The observation of the concerned citizen that the shooters had run into 1115 Abbott Court supplied the threshold probable cause.

It was Detective Sean Harrison who "started getting the warrant together, it was probably around four-thirty, a little before five, five p.m." The warrant was subsequently signed by Judge Dancy and was actually executed at 1115 Abbott Court at 6:20 P.M. In describing the execution of the warrant, Detective Harrison testified that Officer Barnes located the cartridges and brought them to the attention of Detective Harrison. The appellants raise the specter that the evidence at the suppression hearing does not establish unequivocally that Detective Barnes only spotted the cartridges after the arrival of the warrant at 1115 Abbott Court and not in the course of his earlier entry or entries into the residence.

Judge McCurdy, however, found:

[T]he evidence persuades me to find as a matter of fact that the warrant was obtained before the search occurred.

The evidence adduced at the suppression hearing supported that finding of fact. Officer Barnes testified, with respect to his earlier entry of 1115 Abbott Court, that "the dwelling was not searched at this time." Officer Grant testified that he and Officer Barnes "secured the house for purposes of officer safety and did not conduct any sort of search."

Is it possible that Officers Barnes and Grant, even if they did not search 1115 Abbott Court when they first went there early in the afternoon, returned at some later time prior to the arrival of the search warrant and spotted the six cartridges? The only answer is that defense counsel, in cross-examining

the officers, never pursued such a line of inquiry, and we, consequently, have no idea.

Officer Grant had further testified, moreover, that he was with Officer Barnes and that Officer Barnes only recovered the six cartridges after the "proper authorities" had arrived. Is the verb "recover" possibly ambiguous? Does it necessarily preclude having actually spotted the cartridges without necessarily having taken possession of them? This is precisely the type of situation in which looking at that version of the evidence in the light most favorable to the State resolves any ambiguity in the State's favor.

That being said, it is perhaps redundant to add that Detective Harrison made a sworn return on the warrant in which he swore that the six cartridges were *"taken pursuant to the warrant."* That statement permits an inference that the cartridges were "taken" after the warrant arrived on the scene.

As an alternative rationale, we would point out that the only thing revealed by the search of 1115 Abbott Court, early or late, was the presence in the house of the six cartridges. That fact was not a part of the application for the search warrant. The issuance of the search warrant therefore proceeded from an independent source. As Chief Justice Burger stated in *Segura v. United States,* 468 U.S. at 813–14, 104 S.Ct. 3380:

> Whether the initial entry was illegal or not is irrelevant to the admissibility of the challenged evidence because there was an independent source for the warrant under which that evidence was seized. Exclusion of evidence as derivative or "fruit of the poisonous tree" is not warranted here because of that independent source.

■ Even if, moreover, the spotting of the cartridges by Officer Barnes had *arguendo* "jumped the gun," because a valid search warrant proceeding from an independent source was either 1) signed and on its way to 1115 Abbott or 2) not yet signed but in its final countdown to its signing, this would be a classic occasion for the application of the "inevitable discovery" exemption from the exclusionary rule. *Murray v.*

*United States,* 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). As Justice Scalia observed in *Murray,* 487 U.S. at 541, 108 S.Ct. 2529:

> *Knowledge* that the marijuana was in the warehouse was assuredly acquired at the time of the unlawful entry. But it *was also acquired at the time of entry pursuant to the warrant,* and *if that later acquisition was not the result of the earlier entry there is no reason why the independent source doctrine should not apply.* Invoking the exclusionary rule would put the police (and society) not in the *same* position they would have occupied if no violation occurred, but in a worse one.

(Emphasis supplied).

## II. The Challenges for Cause

### A. As to Morris

The contention challenging Judge McCurdy's failure to strike four prospective jurors for cause cannot be sustained by Morris because of the demonstrable absence of prejudice as to him. Morris had twenty peremptory challenges, Maryland Rule 4–313, but only used eleven of them. As Judge Rodowsky pointed out in *White v. State,* 300 Md. 719, 728, 481 A.2d 201 (1984):

> If disqualification for cause is improperly denied, but the accused has not exercised all allowable peremptory challenges, there is no reversible error.

See also *Parker v. State,* 227 Md. 468, 471, 177 A.2d 426 (1962) ("[W]e think it is clear that the defendant (who had not exhausted his challenges) was not prejudiced."); *Thomas v. State,* 50 Md.App. 286, 298, 437 A.2d 678 (1981), *cert. denied,* 292 Md. 639 (1982); *Earhart v. State,* 48 Md.App. 695, 712, 429 A.2d 557 (1981); *McCree v. State,* 33 Md.App. 82, 98, 363 A.2d 647 (1976).

## B. As to Everett

█ Everett, on the other hand, exhausted all of his peremptory challenges and is, therefore, eligible to move forward with his contention. He cites four instances in which Judge McCurdy denied defense motions to have prospective jurors struck for cause. With respect to one of those prospective jurors, Juror No. 386, Everett himself did not move to have the juror struck. Only Morris did. As for Everett, therefore, that particular instance of alleged abuse of discretion is not preserved for appellate review. We turn to the remaining three.

All three prospective jurors in question, Jurors Nos. 457, 505, and 521, honestly indicated, initially, a tentative bias against criminals or in favor of police credibility. Each, however, ultimately stated that he or she would be able to render a fair and impartial verdict based on the evidence in the case.

█ Juror No. 457 was a Baltimore City police officer and indicated an initial tilt in favor of the prosecution. His voir dire examination, however, concluded on the following note.

THE COURT: Let me put it to you this way. If you were chosen as a juror, you would have to take an oath in the beginning of the trial that you would listen to the evidence and make a decision based on the evidence without any bias in favor of or against the defendants? Do you think you could do that?

JUROR NUMBER 457: Oh, I would be fair, yes.

THE COURT: You would?

JUROR NUMBER 457: I would be fair, yes.

. . . .

THE COURT: Would you believe a police officer simply because that person is a police officer, as opposed to another individual who is not a police officer?

JUROR NUMBER 457: I would have to hear the whole story and see what the evidence was.

. . . .

THE COURT: Would your association with [the assistant state's attorney] in any way affect your ability to be fair?

JUROR NUMBER 457: Oh, no, no. Heavens, no.

 Juror No. 505 told the court that she worked for the Division of Correction and that her sister had been raped and kidnapped. Asked initially whether she could be fair, she responded, "I don't know." Her ultimate position, however, was that she could make a decision "based on the evidence without any bias." She affirmed that she could make a decision with an open mind and with no preconceived judgment against the defendants. She stated that she could decide the case based on the burden of proof beyond a reasonable doubt. When finally asked whether she was familiar with the statue of "Lady Justice," she responded that the scales of justice were on an "even keel."

 Juror No. 521 had had "two brothers that was gunned down in the street" and indicated that he might be biased against the defendants.

THE COURT: Do you think that you would be biased against the defendants, or in favor of the defendants?

JUROR NUMBER 521: Probably against. But, then, I have to say I have never did this before.

His final position, however, was that he probably could keep an open mind until he had heard all of the evidence.

THE COURT: Well, let me ask you one more question. If you were chosen as a juror, you would have to take an oath in the beginning of the trial and say that you would listen fairly and impartially to the evidence and make a decision based on that evidence without any bias in favor of or against either side. Do you think you could do that in good conscience?

JUROR NUMBER 521: I probably could, yes, but that doesn't relieve the fact that I have experience—

THE COURT: Oh, I know, your life experience is significant and everyone brings their life experience, but the question is not whether you had this experience, but wheth-

er or not it would affect your ability to be fair. That's the question.

JUROR NUMBER 521: Okay.

THE COURT: And do you think it would affect your ability to be fair?

JUROR NUMBER 521: It's hard to say, but I think that I would probably—I mean, you know, hear the evidence that would be—

THE COURT: Do you think you could keep an open mind until the end?

JUROR NUMBER 521: I probably could. I probably could.

In declining to strike Juror No. 521 for cause, Judge McCurdy observed that "the more we talked, the more [the prospective juror] appeared to be understanding the requirement of being fair and impartial."

With respect to these three prospective jurors there were, to be sure, potential danger signs, but in the last analysis Judge McCurdy had the discretion to go either way. There may have been a potential for bias in the air but there was not, as a matter of law, actual bias on the ground. There were, moreover, countervailing reasons for being parsimonious with challenges for cause. Of 120 prospective jurors who had been called, 53 had been struck for cause. With 12 jurors plus alternates to be seated and with 45 peremptory challenges available to the two defendants and the State, discretion may have argued against being overly profligate or promiscuous with challenges for cause that could have gone either way.

The three challenged denials of disqualification for cause in this case actually may provide valuable insight into how a trial judge sometimes exercises discretion. Because of the answers they ultimately gave, the three prospective jurors in question were not challengeable as a matter of law. Their initial responses, however, were at least enough to make sensitive antennae quiver.

Under those circumstances, a trial judge might choose, albeit not legally required to do so, to exercise discretion by

bending over backwards in a defendant's favor and removing any lingering possibility of juror bias. Such a tilt, however, would be quintessentially discretionary and not something the defendant would be entitled to as a matter of right.

The problem that many defendants and defense counsel have when confronting a discretionary call that does not go in their favor is as a result of the narcissistic belief that the trial interests of the defendant are the only factor that a judge should consider when exercising discretion. That, however, is not the case. The judge is also entitled to consider the trial interests of the State as a legitimate factor. The judge is also, as apparently happened in this case, entitled to consider the administrative or logistical interests of the local criminal justice system itself.

If the drain on the available juror pool threatens to become excessive, the judge, within the discretionary range, may elect to narrow the sluice gates even if, had the prospective jurors been in abundant supply, he might have left the sluice gates wide open. That is the very nature of discretion, and appellate courts, absent a clear abuse, will not second-guess its exercise.

The definitive discussion of challenges for cause in Maryland was Judge Smith's opinion for the Court of Appeals in *Calhoun v. State*, 297 Md. 563, 578–83, 468 A.2d 45 (1983). He quoted with approval, 297 Md. at 580, 468 A.2d 45, from the decision of the United States Supreme Court in *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961):

To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.*

(Emphasis supplied).

He also quoted with approval from the opinion of Judge Alvey in *Garlitz v. State*, 71 Md. 293, 300, 18 A. 39 (1889):

[A]ll that can be required of a juror, to render him competent, is, that he shall be without bias or prejudice for or against the accused, and that his mind is free to hear and impartially consider the evidence, and *to render a verdict thereon without regard to any former opinion or impression existing in his mind,* formed upon rumor or newspaper reports. Whenever it is shown that such is the state of mind of the juror, he should be held to be competent; and such is the rule as laid down by this court in *Waters v. State,* 51 Md. 430 [ (1879) ].

(Emphasis supplied).

As Chief Judge Murphy observed in *Couser v. State,* 282 Md. 125, 138, 383 A.2d 389 (1978):

It is true, of course, that the due process clause of the fourteenth amendment and Article 21 of the Maryland Declaration of Rights guarantee the right to an impartial jury to an accused in a criminal case; *these constitutional guarantees do not, however, insure that a prospective juror will be free of all preconceived notions relating to guilt or innocence, only that he can lay aside his impressions or opinions and render a verdict based solely on the evidence presented in the case.*

(Emphasis supplied).

In *Kujawa v. Baltimore Transit Co.,* 224 Md. 195, 201, 167 A.2d 96 (1961), the Court of Appeals similarly stated:

*A juror to be competent need not be devoid of all beliefs and convictions.* All that may be required of him is that he shall be without bias or prejudice for or against the parties to the cause and possess an open mind to the end that he may hear and consider the evidence produced and render a fair and impartial verdict thereon.

(Emphasis supplied).

We hold that, in denying the three challenges for cause before us, Judge McCurdy did not abuse the wide discretion entrusted to him in regulating the flow of the trial.

## C. The Concurring Opinion

The concurring opinion takes the position that, in failing to strike prospective Juror No. 521 for cause, Judge McCurdy abused his discretion. In our opinion, the concurrence fails to extend to Judge McCurdy the deference that is traditionally paid to discretionary calls, and presumes, on what is ultimately a question of fact, to substitute its judgment for that of the trial judge.

In all of these discretionary calls on challenges for cause, what matters most is the final position asserted by the challenged juror and the judge's conclusion as to the significance of that response. After a lengthy colloquy between Judge McCurdy and Juror No. 521, the final exchange was:

THE COURT: Do you think you could keep an open mind until the end?

JUROR NUMBER 521: I probably could. I probably could.

What does the assertion "I probably could" mean? It might well mean different things and the reading of a cold record will not reveal what it means. The judge on the scene, face to face with the juror and immediately after engaging in an extended exchange with the juror, is infinitely more able than we to make such a determination. The words used are but a small part of the raw material that goes into making such a decision. There is body language. There is tone and force of voice. There is eye contact or lack thereof. There is firmness of intonation and quickness of speech versus equivocation and hesitation.

It is a commonplace that different actors can impart diametrically different meanings into precisely the same written lines. The sentence "I probably can" delivered by a Wally Cox, or a Don Knotts may well communicate hesitation and doubt. The sentence "I probably can," particularly when repeated twice, delivered by John Wayne or by Douglas McArthur might well, by contrast, communicate resolution and iron determination. In the children's classic *The Little Engine That Could,* the inspirational refrain, "I think I can. I

Think I Can! I THINK I CAN!!" is the exemplar, not of doubt and hesitation, but of gritty and not-to-be-denied determination. Judge McCurdy heard the lines as they were delivered; we did not.

Quite aside from non-verbal communication, none of which can be reduced to the typewritten page, even the verbal part of a message depends on more than the words spoken. The same words may have different meanings, and the meanings are determined not so much by the dictionary as by the mind set of the person who utters the words. Careful, scientific types, such as an Einstein or a Fermi, frequently qualify their statements with cautious reservations even when they are 99% certain. More blustering types trumpet their absolute certainty to the high heavens even when they are only 65% certain. One is reminded of Lord Melbourne's characterization of the arrogant self-assurance of the English historian and literary critic Thomas Babington Macauley, "I wish I was as cocksure of anything as Tom Macauley is of everything." The concurring opinion, in characterizing Juror No. 521 as "unable to answer unequivocally," seems to favor the Macauleyesque style.

The court reporter can only take down the words that are uttered. The trial judge, however, makes an on-the-spot assessment of the personality of the person who utters the words. He may prefer Albert Einstein's qualified probabilities to Tom Macauley's cocksure certainties. The appellate judge, by contrast, is stuck with the court reporter. This is why the league office does not reverse a judgment call made by a referee on the field. We, of course, are the league office, and that is why we constantly admonish ourselves to be deferential.

Our point is that the context is indispensable to an understanding of what Juror No. 521 actually was saying. Judge McCurdy was surrounded by that context. We were not. In reviewing a trial judge's exercise of discretion, as in reviewing his fact-finding for clear error, the appellate reviewer should not decide what he or she would probably have done under the

circumstances. That would be, by definition, to substitute one's judgment for that of the trial judge. The appellate court's only proper inquiry is whether the trial judge had some rational basis for exercising his discretion as he did.

Judge McCurdy had just engaged in a reasonably extended colloquy with Juror No. 521. Judge McCurdy looked directly at him. Judge McCurdy made eye contact with him. Judge McCurdy heard him speak. We repeat their last exchange.

THE COURT: Do you think you could keep an open mind until the end?

JUROR NUMBER 521: I probably could. I probably could.

How could we, from a cold record, possibly say that Judge McCurdy had no rational basis for exercising his discretion as he did? That we believe that, had we been there, we would have made a different and more cautious decision is not tantamount to holding that Judge McCurdy abused his discretion. Even if we believed his decision was wrong (we do not), that would not be tantamount to holding that he abused his discretion. Those limitations are implicit in the long settled and firmly established principle that an appellate court does not substitute its judgment for that of the trial court. It would not, of course, even be tempted to substitute its judgment if it did not think the trial court's judgment was wrong. The abuse of discretion goes beyond that, and it did not happen in this case.

### III. Hearsay Evidence

Two eyewitnesses to the murder of Antoine McRay in the early afternoon of July 10, 2001, in the 1000 block of Harford Road in Baltimore City, squarely identified the two appellants as McRay's assailants and further identified Everett as the actual shooter. A third witness, Tyson Watson, did not testify at the trial but, at the pretrial suppression hearing, had also identified Everett as the shooter. At trial, Detective Sean Harrison, in the course of narrating the chronology of the

investigation, testified that Watson had selected a photograph of Everett as one of the perpetrators.

The short answer to the contention that this was inadmissible hearsay is that there was no objection and the issue now being raised was not preserved for appellate review. Maryland Rule 4–323. The fact that Everett twice objected to the State's referring to this hearsay in closing argument is beside the point. An objection to hearsay, if such it was (we do not decide), must come when the evidence is initially admitted. Whatever is once in evidence, rightly or wrongly or simply without objection, is appropriate subject matter for closing argument. As to Morris, moreover, it is not even argued that Watson identified him.

Two other allegations about the erroneous admission of hearsay are inconsequential. When the police conducted a search of 1115 Abbott Court and found six .32 caliber long round-nose Smith and Wesson unspent cartridges, comparable with the bullet taken from McRay's body, they found four individuals at that location, the two defendants and two others. All four were tested for gunshot residue. Only the left hand of Ryan Robinson tested positive. An expert witness from the crime laboratory testified, over objection, that Robinson was right-handed. Morris objected; Everett did not. The short answer to the contention is that, even assuming *arguendo* that this was objectionable hearsay, any assumed error was clearly harmless as to Morris.

The final instance of alleged hearsay involved Detective Johnson's explanation as to why the police did not attempt to take fingerprints from the six recovered cartridges. He explained that a crime lab technician "advised me that only one per cent of the time can you get prints off of objects like bullets." Rather than explain why this was the non-hearsay reason for the police inaction rather than an out-of-court assertion being offered for the truth of the thing asserted, it is simpler to point out that no objection was made to the explanation, and the issue has, therefore, not been preserved for appellate review.

## IV. Jury Instructions and the "Plain Error Doctrine"

On the State's burden of proving the defendant's guilt beyond a reasonable doubt, Judge McCurdy, as we view his jury instructions as a whole, adequately communicated the basic message. He gave, essentially verbatim, *Maryland Pattern Jury Instruction–Criminal* 2:02 on the presumption of innocence and the concept of proof beyond a reasonable doubt.

### A. An Unnoticed Slip of the Tongue

In the middle of that instruction, however, Judge McCurdy misspoke himself on a single adjective. The Pattern Jury Instruction, after pointing out 1) that the State has the burden of proving the guilt of the defendant beyond a reasonable doubt, 2) that the burden remains on the State throughout the trial, and 3) that the defendant is not required to prove his innocence, goes on to explain that the State, however, "is not required to prove guilt beyond all *possible* doubt or to a mathematical certainty." Judge McCurdy's tongue tripped and, instead of saying "beyond all *possible* doubt," he said "the State is not required to prove guilt beyond all *reasonable* doubt."

### B. The Holding

Judge McCurdy was completely unaware of having misspoken. The State was unaware; defense counsel was unaware; and the instructions flowed on smoothly without a ripple of objection. The appellants, with hindsight, would now have us believe that the jurors, with the ears of a gazelle, pounced upon the slip that everyone else had missed and gave it possibly dispositive significance. Accordingly, the appellants call upon us to overlook the preservation requirement of Maryland Rule 4–325(e) and to exercise our extraordinary discretion by way of taking "cognizance of any plain error in the instructions." **We decline to do so.**

## C. The Explanatory Dicta

That five-word holding disposes of the contention. All else is *dicta*. Ordinarily, those five words are all that would be said and all that need be said, for the exercise of our unfettered discretion in not taking notice of plain error requires neither justification nor explanation.[1]

Because defense reliance on the so-called "plain error" exemption from the preservation requirement continues doggedly to exhibit such pandemic proportions, however, it behooves us periodically to reassert why appellate invocation of the "plain error doctrine" 1) always has been, 2) still is, and 3) will continue to be a rare, rare phenomenon. There persists such a chronic misunderstanding of how the plain error exemption operates that it may be helpful if we can set forth, as clearly as we are capable of doing, what the limitations are on the profligate appeal to this exemption. We attempted to do this a decade ago in *Austin v. State*, 90 Md.App. 254, 258, 600 A.2d 1142 (1992):

We choose to restate in a published opinion the hierarchical relationship between the rule and its exception because

---

1. Actually there are some limitations on the affirmative act of noticing plain error. 1) There must be error. 2) It must be plain. *Stockton v. State*, 107 Md.App. 395, 398, 668 A.2d 936 (1995); *Wieland v. State*, 101 Md.App. 1, 33, 643 A.2d 446 (1994) ("The notion of plain error simply does not embrace arcane error."). 3) It must be material. *Rubin v. State*, 325 Md. 552, 588, 602 A.2d 677 (1992); *Sutton v. State*, 139 Md.App. 412, 441, 776 A.2d 47 (2001). With respect to these threshold requirements for the "plain error doctrine" even to come into play, this Court flatly stated in *Stockton v. State*, 107 Md.App. at 398, 668 A.2d 936:

 *Absent plain error, we lack even the discretionary authority to analyze an unpreserved issue.* If words have meaning, moreover, even subtle error presumably does not constitute *plain* error. Otherwise the word "error" would be enough, standing alone, without the qualifying requirement that such error be "plain." In any event, it is only after we have plain error as an established factor in the equation that our discretionary option to notice it or to ignore it even comes into play. *Our belief that an error actually occurred is not the end of our discretionary process, but only its beginning.*

 (Emphasis supplied).

 By contrast, there are no limitations on the negative act of declining to notice plain error.

the exception, through promiscuous indulgence, periodically threatens to swallow the rule. In *Brown v. State,* 14 Md.App. 415, 418, 287 A.2d 62 (1972), Judge Powers pointed out that the "plain error" exception to the rule "leaves slightly ajar the door to appellate relief ..." In *Williams v. State,* 34 Md.App. 206, 207–208, 366 A.2d 399 (1976), we picked up on Judge Powers' metaphor and noted the consequences:

> "Whenever a door is left slightly ajar, there is irresistible temptation on the part of bar, and sometimes even bench, ever to widen the breach. The process is gradual and each progressive nudge imperceptible when viewed alone. *What began, however, as a door almost, though not quite, closed is suddenly perceived to be a door almost, though not quite, wide open.*"

(Emphasis supplied).

In *Himple v. State,* 101 Md.App. 579, 581–82, 647 A.2d 1240 (1994), Judge Cathell quoted with approval from *Austin,* 90 Md.App. at 257–58, 600 A.2d 1142:

> The number of occasions on which we are asked to invoke the "plain error" exemption from the otherwise foreclosing effect of non-preservation through failure to object remains so epidemic that it behooves us periodically, as forcefully as we know how, to do what we can to limit the contagion. Maryland Rule 4–325(e) states the basic and simple principle with unmistakable clarity:
>
> > "No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection."
>
> That is the norm. That is the clearly articulated standard that must be satisfied as a precondition for appellate review. It is the norm to which we have always adhered and to which we shall continue to adhere.

The Court of Appeals has been as rigorous as this Court in adhering steadfastly to the preservation requirement. In

*Walker v. State,* 343 Md. 629, 645, 684 A.2d 429 (1996), Judge Eldridge stated emphatically:

> Maryland Rule 4–325(e), as well as a multitude of cases in this Court, make it clear that *the failure to object to a jury instruction ordinarily constitutes a waiver of any later claim that the instruction was erroneous. See, e.g., Bowman v. State,* 337 Md. 65, 67 [650 A.2d 954] (1994) ("review of a jury instruction will not ordinarily be permitted unless the appellant has objected seasonably so as to allow the trial judge an opportunity to correct the deficiency before the jury retires to deliberate"); *Ayers v. State,* 335 Md. 602, 627–628 [645 A.2d 22] (1994) ("a party who fails to object to a jury instruction at trial may not later raise the issue"); *Baker v. State,* 332 Md. 542, 563 [632 A.2d 783] (1993); *Collins v. State,* 318 Md. 269, 284 [568 A.2d 1] (1990) ("Counsel's failure to except to the reinstruction is indicative of an acceptance.... Under these circumstances, defense counsel has failed to preserve the challenge to the court's instructions").

(Emphasis supplied).

### 1. The Trial Court Must Be Given The Chance To Correct An Easily Correctable Mistake

This case now before us is a classic illustration of one of the key virtues of the preservation requirement. In the course of a lengthy exposition of pertinent law, Judge McCurdy made an inadvertent, subconscious slip of the tongue. Had it been brought to his attention, as the Maryland Rule requires as a prerequisite for preservation, he would immediately have corrected himself. In *Bowman v. State,* 337 Md. 65, 69, 650 A.2d 954 (1994), Judge Raker referred to this clear purpose of the preservation requirement:

> *The purpose of Rule 4–325(e) is to give the trial court an opportunity to correct an inadequate instruction.* Here, the court conferred with counsel at the bench after the instructions were given but before the jury retired. By failing to offer specific additional instructions at this time, appellant waived his objection. We therefore hold, in accor-

dance with Maryland Rule 4–325, that the issue is not preserved for our review.

(Emphasis supplied).

In *Johnson v. State*, 310 Md. 681, 686, 531 A.2d 675 (1987), Judge Eldridge highlighted the same salutary purpose of the preservation requirement:

> The language of the rule plainly requires an objection after the instructions are given, even though a prior request for an instruction was made and refused.
>
> *There are good reasons for requiring an objection* at the conclusion of the instructions even though the party had previously made a request. *If the omission is brought to the trial court's attention by an objection, the court is given an opportunity to amend or correct its charge.*

(Emphasis supplied). See also *Thomas v. State*, 143 Md.App. 97, 116, 792 A.2d 368 (2002).

In *Canter v. State*, 220 Md. 615, 617, 155 A.2d 498 (1959), the Court of Appeals again emphasized that *the rule*

> *was designed to afford the trial judge an opportunity to correct inadvertent omissions or inaccuracies in a charge,* and that *we would not exercise our right to "take cognizance of and correct any plain error material to the rights of the accused,"* of our own motion, *if the alleged error was one that might have been readily corrected if it had been called to the trial judge's attention.*

(Emphasis supplied). In *Reynolds v. State*, 219 Md. 319, 324–25, 149 A.2d 774 (1959), the Court had similarly noted that the preservation requirement protects the trial judge from being sandbagged:

> In this case it is obvious that *the errors complained of are such that the trial court could have*—and undoubtedly would have—*corrected [them] if the defendant had interposed her objections, as she should have done,* before the jury retired to consider its verdict.

(Emphasis supplied). *Bennett v. State*, 230 Md. 562, 568, 188 A.2d 142 (1963), reiterated the same overarching purpose:

*The purpose of Maryland Rule* [now 4–325(e) ]—which requires that objections to instructions shall be made before the jury retires to consider its verdict—*is to give the trial court an opportunity to* amplify or *amend its charge if it deems* amplification or *amendment necessary.*

(Emphasis supplied).

In *Parker v. State,* 4 Md.App. 62, 67, 241 A.2d 185 (1968), Chief Judge Robert C. Murphy (later Chief Judge of the Court of Appeals) stated clearly for this Court:

*The reason for the rule* requiring objection as a prerequisite to appellate review *is a salutary one,* being designed *to afford the trial judge an opportunity to correct inadvertent omissions or inaccuracies in his instructions, where the alleged error is one that might have been readily corrected if it had been called to the trial judge's attention.*

(Emphasis supplied). See also *Anderson v. State,* 12 Md.App. 186, 203, 278 A.2d 439 (1971); *White v. State,* 8 Md.App. 51, 258 A.2d 50 (1969); cf. *Leatherwood v. State,* 49 Md.App. 683, 694–95, 435 A.2d 477 (1981); *Vernon v. State,* 12 Md.App. 157, 163, 277 A.2d 635 (1971).

## 2. Even Plain and Material Error Is Only The Threshold For the Discretionary Exercise

The appellants nonetheless argue strenuously that Judge McCurdy's slip of the tongue, albeit inadvertent, may have confused the jury and that that possibility itself constituted grievous error. At that half-way point in their syllogism, they stop and sit contentedly on their major premise with no thought as to how to move on from that point to their desired conclusion. The mere existence of error, in and of itself, has very little to do with the distinct question of why the appellate court, in its discretion, would wish to take official notice of the error, even assuming it to have occurred. If every material (prejudicial) error were *ipso facto* entitled to notice under the "plain error doctrine," the preservation requirement would be rendered utterly meaningless. In all of the numerous instances where a Maryland appellate court has declined to notice

plain error, it was, at the very least, assumed that some plain and material error has actually occurred.

The fact of instructional error is in no way dispositive of the preservation issue. The preservation rule contemplates error. It assumes that an error has probably occurred. Its concern is that the error was not brought to the trial judge's attention so that he could have had the opportunity to correct it. Indeed, if the instruction in question were not in error, it would make very little difference whether the point had been preserved or not.

Many trial advocates seem to suffer the misapprehension that if the instructional error, even in the absence of an objection, is plain and is material to the rights of the accused, the appellate court is thereby divested of its discretion and is required to consider the contention on its merits. The appellate discretion is not so cabined. On the question of overlooking non-preservation, the appellate discretion is plenary.

The fact that an error may have been *prejudicial* to the accused does not, of course, *ipso facto* guarantee that it will be noticed. As Judge Thompson pointed out in *Sine v. State*, 40 Md.App. 628, 632, 394 A.2d 1206 (1978):

> *The mere fact that the alleged error may have resulted in some prejudice to the appellant does not, in itself, justify the invocation of the plain error rule.* Otherwise, any error that could not be considered harmless would be reviewable and Rule 757 f and h would be meaningless.

(Emphasis supplied).

Nor does the fact that an error may have been *plain ipso facto* guarantee that it will be noticed. As Chief Judge Robert C. Murphy, on assignment to this Court in *Squire v. State*, 32 Md.App. 307, 309, 360 A.2d 443 (1976), *rev'd on other grounds*, 280 Md. 132, 368 A.2d 1019 (1977), explained:

> *[E]ven if an error in jury instructions is plain, its consideration on appeal is not a matter of right; the rule is couched in permissive terms and necessarily leaves its exercise to the discretion of the appellate court.* (citation omitted).

(Emphasis supplied). See also *Reynolds v. State*, 219 Md. 319, 324, 149 A.2d 774 (1959); *Williams v. State*, 34 Md.App. 206, 211, 366 A.2d 399 (1976) ("Even granted harmful and material error of constitutional dimensions, notice thereof is still the exception and not the rule."); *Brown v. State*, 14 Md.App. 415, 418, 287 A.2d 62 (1972) ("We take it that if the error is not plain, or if it is not material to the rights of the accused, the appellate court would in no event consider it. Even if the error meets both of these tests, its consideration on appeal is not a matter of right, for the use of the word 'may' makes it permissive, and necessarily leaves its exercise to the discretion of the appellate court.").

As recently as in *Perry v. State*, 150 Md.App. 403, 436, 822 A.2d 434 (2002), we strove to drive home the point that even the likelihood of reversible error is no more than a trigger for the exercise of discretion and not a necessarily dispositive factor.

> There is a naive assumption that if a contention would prevail on its merits that it should be noticed under the "plain error" exemption, even if not preserved. *Reversible error, however, is assumed, as a given, before the purely discretionary decision of whether to notice it even comes into play.*

(Emphasis supplied).

### 3. A Reasonable Doubt Instruction Does Not Enjoy Any Special Status

At oral argument, the appellants enjoined us to exercise the extraordinary prerogative of noticing an unpreserved error by ascribing to a jury instruction on proof beyond a reasonable doubt the exalted status, rivaled only perhaps by the Magna Carta, of being the very keystone in our pantheon of civil liberties.[2] The appellants virtually have us standing at Concord Bridge. Tarnishing that purportedly unique escutcheon, however, is the countervailing opinion of the Court of Appeals in *State v. Rose*, 345 Md. 238, 691 A.2d 1314 (1997).

---

**2.** We trust we are not being unduly cynical in noting that the keystone in the civil liberties pantheon seems to shift, on a very *ad hoc* and case

In *State v. Rose,* the point of analytic departure was a "reasonable doubt instruction" that "was constitutionally deficient." In an unreported opinion resolving an appeal from the granting of post-conviction relief, this Court held that by "instructing the jury that the term 'beyond' had no meaning, the trial judge placed a lesser burden of proof upon the State than the law requires." 345 Md. at 242, 691 A.2d 1314. In the *Rose* case, to be sure, we were dealing with the foreclosing effect of non-preservation at a second level of remove from the trial table. The resolution of the "special status" claim, however, has equal applicability to non-preservation in either the first or second generation.

There had been no objection to the "reasonable doubt" instruction at the trial. No challenge to that instruction was raised in the direct appeal of the conviction to this Court. No challenge to the instruction was raised in the first post conviction petition. In a second post conviction petition, however, Rose argued for the first time that "the reasonable doubt instruction given at his trial was constitutionally deficient, depriving him of his constitutional right not to be convicted by less than proof 'beyond a reasonable doubt.' " 345 Md. at 241, 691 A.2d 1314. The State's position was that Rose's failures to have raised the issue on three prior occasions constituted a waiver.

> *The State argued that the requirements for waiver of a reasonable doubt jury instruction are the same as those for waiver of any other jury instruction in a criminal case,* and that Rose's failure to object to the instruction at trial, or raise the issue on direct appeal, or raise it in his first post conviction petition, constituted a waiver of the issue.

345 Md. at 241, 691 A.2d 1314 (emphasis supplied).

The trial court denied the second petition for post-conviction relief, agreeing with the State that Rose's failures to raise the issue amounted to a waiver of it. This Court, however,

---

by case basis, to whatever legal principle was allegedly violated in the case then being argued.

reversed the trial court. We based our decision to overlook the preservation requirement on what we deemed to be the special or "fundamental" status of "the right to a correct reasonable doubt instruction." We held that a defendant's entitlement to challenge the loss of such a right could not be forfeited simply by his procedural inaction.

The Court of Special Appeals framed the issue as "[whether the right to ... a correct reasonable doubt instruction ... involves a fundamental ... or a non-fundamental right," noting that this Court has held that the right to a correct reasonable doubt instruction "is constitutionally mandated by the due process clause of the Fourteenth Amendment ... and is an indispensable component of every criminal proceeding." *The appellate court reasoned that, because this important right was derived from the Constitution, it was a "fundamental" right and that "intelligent and knowing" action by the defendant was required for a waiver to occur.* Because the circuit court had applied the standard of waiver by inaction, rather than the "intelligent and knowing" standard, the intermediate appellate court vacated the judgment and remanded the case for reconsideration by the circuit court under the intelligent and knowing standard for waiver.

345 Md. at 242, 691 A.2d 1314 (emphasis supplied).

The Court of Appeals granted the petition for certiorari filed by the State and reversed the decision of this Court. Before the Court of Appeals, Rose continued to argue that a "correct reasonable doubt jury instruction" enjoyed a special status.

Rose contends, however, that the right to a correct reasonable doubt jury instruction, a concept embodied in the due process clauses of the federal and state constitutions, is "among those rights ... intended to preserve the fairness of a criminal trial and ... enhance the reliability of its truth-determining function...."

345 Md. at 245, 691 A.2d 1314.

Before rejecting it, the Court of Appeals squarely confronted the argument that "reasonable doubt instructions, as op-

posed to other types of jury instructions" were entitled to special treatment.

> *Rose,* however, strenuously *argues that claims of error concerning defective reasonable doubt instructions, as opposed to other types of jury instructions, "plainly concern 'basic rights of a constitutional origin' ... intended to preserve the fairness of a criminal trial and to enhance the reliability of the truth-determining function"* to which the *Johnson v. Zerbst*[, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)] "intelligent and knowing" waiver standard has been historically applied. Thus, in his view, deficient reasonable doubt instructions constitute "errors of constitutional magnitude," and require an intelligent and knowing waiver by the defendant.

345 Md. at 247, 691 A.2d 1314 (emphasis supplied).

Judge Eldridge first reiterated, 345 Md. at 245–46, 691 A.2d 1314, the basic rule that the failure to object to a jury instruction precludes further review.

> The general rule is that *the failure to object to a jury instruction at trial* results in a waiver of any defects in the instruction, and *normally precludes further review of any claim of error* relating to the instruction. *See* Maryland Rule 4–325(e).

(Emphasis supplied). He further observed that the failure to object not only foreclosed direct review but also "constitute[d] a waiver of the issue for purposes of the Maryland Post Conviction Procedure Act." 345 Md. at 246, 691 A.2d 1314.

The Court of Appeals then squarely rejected the notion that a complaint is exempt from procedural default simply because it involves a "fundamental" or constitutional right or a right designed "to ensure the fairness of a criminal trial."

> *[M]ost rights applicable in criminal trials are important to ensure the fairness of the criminal trial.*

> Our cases make it clear that, simply because an asserted right is derived from the Constitution of the United States or the Constitution of Maryland, or is regarded as a "fundamental" right, does not necessarily make the "intelligent

and knowing" standard of waiver applicable. Rather, *most rights, whether constitutional, statutory or common-law, may be waived by inaction or failure to adhere to legitimate procedural requirements.*

345 Md. at 247–48, 691 A.2d 1314 (emphasis supplied).

Judge Eldridge's opinion concluded, 345 Md. at 250, 691 A.2d 1314, by noting the mischief that could result from the failure to hold defense counsel to the rigors of the preservation requirement.

> *[T]he position advocated* by Rose and the Court of Special Appeals *would allow defense attorneys to remain silent in the face of the most egregious and obvious instructional errors* at trial. *Any resulting conviction would always be vulnerable to challenge* because of the absence of an "intelligent and knowing" waiver by the defendant himself.
>
> ... *Allegations of this type may be effectively waived by the failure of the defendant or his attorney to object at trial* or their failure to raise the issue on direct appeal.

(Emphasis supplied).

### 4. A Particular Exercise of Discretion Does Not Establish a Precedent

In the path of a precedential juggernaut, the appellant's reliance on *Himple v. State*, 101 Md.App. 579, 647 A.2d 1240 (1994), where we chose to notice a plain error in a reasonable doubt instruction, is doubly misplaced. In the first place, the error in that case was far more egregious than the one here. As Judge Cathell observed, 101 Md.App. at 582, 647 A.2d 1240, "[T]he jurors were instructed that if they were convinced that it was *probable* that appellant committed the offense, they could convict him of the charges."

In the second place and even more to the point, the discretionary decision of an appellate panel to notice plain error is totally *ad hoc* and a decision by one particular panel on one particular occasion to notice plain error is by no means precedentially binding on subsequent panels on subsequent occasions, even when similar subject matter seems to be

involved. A particular exercise of discretion may be inspired by any number of reasons, some of which have nothing to do with the subject matter of the jury instruction in question. See *Austin v. State*, 90 Md.App. at 270–72, 600 A.2d 1142. See also *Jeffries v. State*, 113 Md.App. 322, 325–26, 688 A.2d 16 (1997). An exercise of discretion, by its very nature, does not establish a precedent.[3]

### 5. Consistency Is Sometimes Contraindicated

We can anticipate a defense argument that even if the notice of plain error on an earlier occasion is not precedentially binding on the exercise of discretion as to the same issue on a subsequent occasion, the policy consideration of being consistent would nonetheless dictate reaching the same result. Such an argument, however, betrays a fundamental misunderstanding of the open-ended variety of reasons that may inspire the exercise of appellate discretion. Some of those reasons have little, or nothing, to do with the possible impact of an error on a particular verdict. A quick look at some of those reasons for the appellate exercise of discretion in this area may help to illustrate why consistency is sometimes immaterial and is sometimes even contraindicated.

### a. The Opportunity to Utilize an Unpreserved Contention as a Vehicle

We explained in *Austin v. State*, 90 Md.App. at 271, 600 A.2d 1142, that sometimes an appellate court is motivated to take notice of some unpreserved plain error not because of the possible impact of the error on a particular defendant but because of the opportunity to use the contention as a desired vehicle for exploring some hitherto unexplored area of the law.

---

**3.** The fact that a particular panel on a given occasion may have noticed plain error with respect to a particular instruction is no more precedential authority for future noticing than the fact that other panels on other occasions may have declined to notice is precedential authority for not noticing. As a discretionary matter, it is up to each panel on each occasion to decide what it wants to do for whatever reason, and nothing to be found in the case law is controlling as to that decision.

On rarer occasions, we might even be influenced by the opportunity which the notice of "plain error" might afford to illuminate some murky recess of the law. *The interpreting and molding of the law is as weighty a consideration in appellate councils as is the correction of error in individual cases.*

(Emphasis supplied).

Indeed, in *Evans v. State,* 28 Md.App. 640, 650–51, 349 A.2d 300 (1975), *aff'd, State v. Evans,* 278 Md. 197, 362 A.2d 629 (1976), we acknowledged that we had chosen to notice the "plain error" in that case precisely because of its vehicular utility.

"[W]e exercise our discretion in noticing this particular 'plain error' because of the legion of cases already beginning to surface in the wake of *Mullaney v. Wilbur,*[ 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975)] and because of the inevitably greater legions yet to follow. *We deem a prompt review* of these instructions, and those like them, *'necessary* to serve the ends of fundamental fairness and substantial justice' *even beyond the confines of this particular case. This case is, in short, an appropriate and necessary vehicle.*"

(Emphasis supplied).

In *Stockton v. State, supra,* the appellant, as in this case, complained about "an erroneous instruction to the jury on the subject of the State's burden of persuasion." 107 Md.App. at 396, 668 A.2d 936. In urging us to notice "plain error," he relied upon the fact, as do the appellants here, that we had earlier taken notice of an arguably similar "plain error" in *Himple v. State, supra.* In declining to take notice, we explained why repeating an exercise of discretion would serve no purpose when the earlier exercise had been motivated by the desire to use the case as an expository vehicle.

The appellant leans heavily on *Himple v. State,* an occasion on which we opted to notice plain error with respect to an instruction on the subject of reasonable doubt. An exercise of discretion by an appellate court, however, unlike

a ruling of law, is unique and unreviewable and is not, therefore, precedent for the next occasion when an exercise of discretion is requested, even on the same subject and under similar circumstances. Indeed, *an earlier discretionary notice of plain error actually argues against its repetition.* One of the reasons we sometimes elect to overlook non-preservation has nothing to do with the fortunes of the appellant. We may choose to notice plain error simply to seize the occasion as a vehicle to communicate a desired message to bench and bar that might otherwise go unsent. *Once having delivered a message, as in Himple, there is self-evidently less urgency to send it again, by way of redundant repetition.* In this respect, the existence of *Himple* hurts the appellant more than it helps him.

107 Md.App. at 396–97, 668 A.2d 936 (emphasis supplied).

The contention now urged upon us has no value as an expository vehicle. The legal issue involved lies in a field that has already been thoroughly ploughed.

### b. The Egregiousness of the Error

In *Austin v. State,* 90 Md.App. at 268, 600 A.2d 1142,. we discussed the egregiousness of the judge's mistake as a factor that might influence the appellate exercise of discretion.

From time to time, we may be influenced by the egregiousness of the error. We are not talking about mere misstatements of the law.... As we pointed out in *Williams v. State,* 34 Md.App. 206, 211 [366 A.2d 399]:

"While we might choose not to notice some inartful or garbled definition of that indefinable abstraction called 'proof beyond a reasonable doubt,' we should almost certainly notice an erroneous instruction that presumed a defendant to be guilty until proved innocent and which placed upon him the full burden of proving his innocence upon the ultimate merits. *Where error is flagrant and outrageous, we retain the residual option to notice it and to intervene. It is the extraordinary error and not the*

*routine error that will cause us to exercise the extraordinary prerogative."*

*The error in this case, although unmistakably a misstatement of the law, was by no means egregious.*

(Emphasis supplied).

In the case before us, we are dealing with an inadvertent slip of the tongue that nobody at the time noticed. It may have been a human frailty, but it was by no means egregious. Nor was it extraordinary. Nor was it flagrant and outrageous.

### c. The Nature of the Impact

In terms of the countless variables that make each exercise of discretion unique, there is one that is seldom, if ever, talked about but which always looms in the background. If in a rare case an appellate court would be actually troubled by the "gut feeling" that a substantive, as opposed to merely procedural, miscarriage of justice had occurred, to wit, that a factually innocent person had been erroneously convicted, that court would bend over backwards to find some way to reverse the conviction. That would include a decision to notice plain error. In *Austin v. State*, 90 Md.App. at 269–70, 600 A.2d 1142, we also spoke of this distinction.

We would be inhuman if we would not be more moved to intervene in the case of a probably erroneous conviction of a true innocent than in a case where the error only facilitated the conviction of a clear miscreant. *It is not to disparage unfairly the latter concern to acknowledge that it is, in any event, less weighty than the former.*

(Emphasis supplied).

We spoke of the same distinction in *Perry v. State*, 150 Md.App. at 437, 822 A.2d 434.

Without condoning either one, *there is a moral distinction between an erroneous conviction of one who is almost certainly guilty and an erroneous conviction of one who is*

*quite possibly truly innocent. Such moral,* even if extralegal, *distinctions do influence the exercise of discretion.* (Emphasis supplied).

In this case, we have no qualms that the appellants were two factually innocent citizens who were erroneously convicted of crimes with which they were totally uninvolved.

In a sense tied in with this reason for the exercise of discretion is perhaps the biggest failure of counsel in trying to persuade an appellate court to overlook non-preservation. They argue as if due process were in issue, ignoring the overarching fact that the absence of an objection means that whatever process might otherwise have been available is no longer due. They blithely forego any effort to persuade the appellate court as to why it would wish to reverse a conviction it is not required to reverse. We spoke of this in *Perry v. State,* 150 Md.App. at 438, 822 A.2d 434.

All of this brings us down to a truism about appellate psychology that most appellants seem stubbornly unwilling to comprehend. When invoking unreviewable discretion, *the arguments must appeal as much, if not more, to what the judge feels as to what the judge thinks.* Appellants, however, treat the legal argument in a "plain error" case just as if it had been preserved for review and just as if a reviewing panel were champing at the bit for a chance to address it. *They blithely ignore the very real question of why the reviewing panel, if not required to address an issue, would wish to do so.*

(Emphasis supplied).

The failure we so often see when the "plain error" exemption is invoked is the failure to realize the chasm of difference between due process and gratuitous process and the different mind sets that reviewing judges, in the exercise of their discretion, in all likelihood bring to bear on those two very different phenomena. We tried to explain this difference in *Jeffries v. State,* 113 Md.App. 322, 325–26, 688 A.2d 16 (1997).

When due process demands, the law will reverse the conviction of an undisputed and cold-blooded killer even on

a technicality, *because it must.* A critical component of that principle, however, is the qualifying clause "because it must." It is not with any sense of satisfaction that a court reverses on a technicality. When it does so, it does so reluctantly and with heavy heart, and *only because it must.* The philosophical converse is that when the procedural posture of an issue makes a reversal on a technicality a consequence that is not compelled but only gratuitously permitted, a court is frequently not motivated to be thus gratuitous.

There is a vast philosophical, as well as legal, distinction between due process and gratuitous process. There are procedural requirements that must be satisfied before *process* literally becomes *due.* For a reviewing court to overlook a precondition for review or to interpret loosely a procedural requirement, on the other hand, is an indulgence in favor of a defendant that is purely gratuitous. Even those who are indisputably factually guilty are entitled to due process. By contrast, only instances of truly outraged innocence call for the act of grace of extending gratuitous process. This appeal is not a case of outraged innocence qualifying for an act of grace.

(Emphasis in original). See also *Fisher and Utley v. State,* 128 Md.App. 79, 107–08, 736 A.2d 1125 (1999), *aff'd in part and vacated in other respects,* 367 Md. 218, 786 A.2d 706 (2001).

In this case, the evidence showed that on Harford Road at one o'clock in the afternoon the appellant Morris walked up to Antoine McRay and held him around the neck while the appellant Everett walked up and shot McRay through the heart. This was not a case of "outraged innocence qualifying for an act of grace."

### d. Lawyerly Diligence or Dereliction

There is another factor that sometimes influences the appellate exercise of discretion that is unconcerned with the nature of the error or with its impact on the defendant. From time to time, we may be influenced by the degree of dereliction of

the attorney in not lodging timely objection to an erroneous instruction. Criminal defense attorneys are called upon to be not simply as knowledgeable about the law as is the judge, but also, particularly pertinent in this case, just as alert.

On this issue, *Stockton v. State* observed, 107 Md.App. at 397–98, 668 A.2d 936:

> The appellant offers us no good reason why defense counsel should not have been expected to be just as current on the Maryland case law as defense counsel now suggests the trial judge should have been. It is our reliance on the professional expertise of lawyers, after all, that causes us to make such a fetish out of a defendant's right to the assistance of counsel. The defense attorney should be far better prepared on a case than the trial judge, who frequently sees it fresh on the morning of trial. With criminal defense attorneys, moreover, frequently being specialists in their field while trial judges are required to be generalists, one could argue that there is an even greater demand that counsel be alert to the latest nuances and oscillations in the law. There certainly should not be less demand.

Resourceful advocates frequently urge upon us the desirability of noticing "plain error" as a needed sanction against judges who fail to state the law with full accuracy. That argument overlooks the concomitant desirability of holding fast to the rigors of Rule 4–325(e) as a needed sanction against lawyers who fail to spot the issues except in hindsight, who fail to focus the attention of the judge upon the issues, and who fail to make a proper record for appellate review. They must never be lulled into the sense of false security that the notice of "plain error" is routinely available to pull neglected chestnuts out of the fire. The sanction cuts both ways.

\* \* \*

When all is said and done about an appellate court's discretionary option to indulge the "plain error" exemption from the preservation requirement, the only hard and fast rule is that there are no hard and fast rules.

## The Spin–Off Subcontention

The appellants' spin-off contention about the failure of Judge McCurdy to intervene, *sua sponte*, during the State's closing argument to the jury is also foreclosed from appellate consideration by the failure of defense counsel to make any objection to the State's argument. *Bates and Beharry v. State*, 127 Md.App. 678, 703, 736 A.2d 407, *cert. denied*, 356 Md. 635, 741 A.2d 1095 (1999); *Icgoren v. State*, 103 Md.App. 407, 442, 653 A.2d 972, *cert. denied*, 339 Md. 167, 661 A.2d 700 (1995).

## V. The *Hicks* Mess

Both appellants claim that all charges against them should have been dismissed because of a violation of Maryland Rule 4–271, requiring that the trial of a defendant commence within 180 days "after the earlier of the appearance of counsel or the first appearance of the defendant before the circuit court pursuant to Rule 4–213." It is agreed by all parties that both appellants were arraigned on October 9, 2001 and that the 180th day thereafter was Sunday, April 7, 2002.

Because the 180th day was a Sunday, however, the pertinent time period was extended by one additional day. Maryland Rule 1–203, dealing with the computing of time deadlines, provides in pertinent part:

The last day of the period so computed is included unless:

(1) It is a Saturday, Sunday, or holiday, in which event the period runs until the end of the next day that is not a Saturday, Sunday, or holiday.

Thus, Monday, April 8, albeit the 181st day, fell within the permissible period for the commencement of a trial. As will be more fully discussed, the trial had actually been postponed until April 8. The case was called on that day. Although the court was available and the State was ready, the trial could not go forward. Just prior to the commencement of the rescheduled trial on May 17, both appellants moved to have the charges against them dismissed. Judge McCurdy denied their motions.

## A. As to Everett

The quick answer to the contention as far as Everett is concerned is that he is responsible for the fact that his trial did not go forward on April 8. When the case was called, his attorney was not present. Counsel for Everett, whose wife had a baby on April 1, went on paternity leave as of that day and did not return to work until May 10. Counsel for Everett acknowledged that he was not in court on April 8 because of the recent birth of his child.

Although the events of May 6 are beyond the date of the critical postponement, they throw some light on the cause of the earlier postponement. The case, which had been on the so-called "stack list" and put over from day to day, was again called on May 6. Counsel for Everett was still on paternity leave but his supervisor in the Public Defender's Office, Ms. Ranier, did appear. She wanted the advantage of a postponement without the disadvantage of having asked for it. She did not want to go to trial as substitute counsel but neither did she want to be in the position of asking for a postponement, until Judge McCurdy forced her hand. As he, in ultimately denying the motions to dismiss, summarized the situation before him.

> So they were finally called and, obviously, *[counsel for Everett] was not available because he was still on paternity leave. The case came in. Ms. Ranier came in and she didn't want to ask for a postponement. I guess her theory was that this was not a defense request for a postponement.* So I said, "Okay. Well then, [counsel] should be here at 2:00." Then the case went to administrative court and Judge Brown found good cause.

> Now, technically, that case had been carried from day to day in my court pending trial and called for trial until that day. It had been called prior to *Hicks* and it was essentially in a suspended state for various reasons from that day until the day that it came in with Ms. Ranier. *So, at that point, I said, "I'm not going to postpone the case. If you want it postponed, you have to go to the administrative*

*judge," and she didn't want to do that, but she went and Judge Brown did find good cause to postpone the case until May 13.*

(Emphasis supplied).

In *Dorsey v. State,* 349 Md. 688, 709 A.2d 1244 (1998), the voluntary failure of a defendant to appear on the scheduled trial date was deemed to be tantamount to a defense request for a postponement, thereby foreclosing the dismissal of charges as a sanction for the violation of the 180–day rule. In the present case, to be sure, we have the voluntary non-appearance of Everett's attorney on April 8 rather than the non-appearance of Everett himself. We hold that the two varieties of voluntary non-appearance are indistinguishable in terms of their foreclosing consequences. With regard to those consequences, Chief Judge Bell stated clearly, 349 Md. at 707, 709 A.2d 1244:

*When,* as here, *a criminal defendant fails to appear on the day of the scheduled trial, the question* presented and, thus, the determination to be made *is whether the defendant is seeking a trial date beyond the 180–day limit.* That is an inquiry that is dependent upon whether the defendant's non-appearance is voluntary or involuntary and that inquiry is informed by the facts and circumstances surrounding it. It is, in short, a question of fact, addressed to the trial court. *If the trial court,* as the fact-finder, *concludes,* based on the facts and evidence presented by both the defendant and the State, *that the defendant's failure to appear at trial was deliberate,* a voluntary act, *then it will find that the defendant has sought, and consented to, a trial date in violation of § 591 and Rule 4–271.* In that event, although the State is not relieved of its obligations with respect to bringing the defendant to trial, *dismissal is not the mandated sanction.*

(Emphasis supplied).

In the case of Everett, the defense thus sought the postponement that carried the trial beyond April 8. In such a case, *State v. Hicks,* 285 Md. 310, 403 A.2d 356, on motion for reconsideration, 285 Md. 334, 335, 403 A.2d 368 (1979), made it

clear that the dismissal of charges is not the appropriate sanction.

> *There are two circumstances,* however, *under which dismissal is not an appropriate sanction* for violation of [Maryland Rule 4–271].
>
> . . . .
>
> *A second circumstance where it is inappropriate to dismiss the criminal charges is where the defendant, either individually or by his attorney, seeks or expressly consents to a trial date in violation of [Rule 4–271]. It would,* in our judgment, *be entirely inappropriate for the defendant to gain advantage from a violation of the rule when he was a party to that violation.* In this respect, the situation is analogous to the well-established principle that a criminal defendant who seeks or expressly consents to a mistrial, even though the required "manifest necessity" standard for the mistrial may have been absent, cannot take advantage of his own act and prevent a retrial on double jeopardy grounds.

(Emphasis supplied). See also *State v. Brown,* 307 Md. 651, 658, 516 A.2d 965 (1986); *Calhoun v. State,* 299 Md. 1, 6, 472 A.2d 436 (1984); *Farinholt v. State,* 299 Md. 32, 40, 472 A.2d 452 (1984) ("As the party who sought the ... postponement and agreed to a new trial date thereafter, the defendant may not challenge the propriety of the ... postponement."); *Reimsnider v. State,* 60 Md.App. 589, 598, 483 A.2d 1324 (1984) ("[W]hen the defendant seeks or expressly consents to a trial date in violation of this rule, he waives his rights to sanctions."); *Miller v. State,* 53 Md.App. 1, 6, 452 A.2d 180 (1982).

As to Everett, the motion to dismiss the charges was properly denied.

### B. As to Morris

In turning to the contention as urged by Morris, we are presented with a bit more of a sticky wicket. Even in the case of Morris, however, we hold that the dismissal of charges

is not an appropriate sanction. At the request of Morris and on the basis of a representation by Morris on which everyone relied, Judge McCurdy sent this case to Judge Roger W. Brown, the administrative judge's designee as the judge responsible for ruling on postponements of criminal trials. Judge McCurdy believed that Judge Brown would rule on whether good cause existed to carry the trial date beyond the 180–day limit. Judge Brown, in turn, believed the same thing and ruled that there was, indeed, good cause to postpone the trial beyond the limit. Counsel for the State, counsel for Everett, and counsel for Morris all also believed that that was exactly what Judge Brown's ruling had done. Only in hindsight has Morris now spotted the nuance of the calendar that caused Judge Brown's apparent postponement of the case until the 181st day to be, in fact, only a postponement to the 180th day and, therefore, not the critical postponement called for under the *Hicks* rule.

The subtle miscalculation may be better understood if we back up two weeks in our narration. The case was called for trial on Monday, March 25, the "167th day" for *Hicks* purposes. That was clearly within the *Hicks* time limit and no one was even referring to it in terms of its being the 167th day. There followed three days of motions hearings, on Monday, Tuesday, and Wednesday, March 25, 26, and 27. At the conclusion of the proceedings on Wednesday afternoon, the State inquired as to the further trial schedule.

Judge McCurdy pointed out that he had a number of alleged violations of probation to dispose of on Thursday morning and hesitated to start the process of picking a jury on Thursday afternoon because the process could almost certainly not be completed that day. Friday, March 29, was Good Friday, a personal leave day even if not a legal holiday. The reason for not continuing the jury selection process on Monday, April 1, was that defense counsel for Morris had indicated that he would not be available from the entire week of April 1 through April 5. Judge McCurdy, counsel for the State, and counsel for Everett were all willing to accommodate that request by Morris's lawyer. The next available day for re-

suming the trial was Monday, April 8. The colloquy ran as follows:

THE COURT: Tomorrow is a collateral day, which means that I have violations of probation and I don't have the number of cases. Do you have the files for tomorrow yet, Mike?

THE CLERK: I'll have them soon.

THE COURT: But in any event, *even if I only have twenty cases and I'm sure I have at least twenty cases, there's no way that we could possibly select a jury in the afternoon in a homicide case involving two defendants which is a twenty and forty strike case. The following day is Good Friday. I do not believe that it would be fair to any jury to pick the jury on Good Friday and have them return a week later, because Mr. Fleming [counsel for Morris] has indicated that he's not going to be available the following week.*

So what I will do is adjourn this case until Monday, April 8th. I understand [counsel for Everett's] concern [4] but that is something that we'll have to address, you know, if the occasion arises.

(Emphasis supplied).

At that point, it was Morris, through counsel, who first raised the specter that a trial date of April 8 might well already be a *Hicks* violation. His point seemed well taken in that April 8 was literally the 181st calendar day from when the *Hicks* clock began to tick. Counsel for Morris, however, seemed to indicate that the postponement to April 8 was acceptable to him.

MR. FLEMING [Morris's lawyer]: Your Honor, I don't mean to be disingenuous but my client points out to me that *April 8th might be beyond Hicks.*

THE COURT: Well—

---

4. Counsel for Everett had scheduled paternity leave for early April.

MR. FLEMING: And *I don't believe that is really an issue.*

(Emphasis supplied).

All parties simply relied on the representation that April 8 might well be a *Hicks* violation. They did not sit down with their calculators and calendars and come up with the fact that the 180th calendar day fell on a Sunday and did not, therefore, count for *Hicks* purposes. No one then appreciated that the 181st calendar day was only the 180th day for purposes of *Hicks* calculations, a day just inside the wire rather than just outside it.

Accepting the fact that April 8 was probably beyond the limit, Judge McCurdy commendably insisted that counsel go before Judge Brown for a "good cause" ruling.

THE COURT: Well, I'm not sure, and unfortunately in all of these cases hindsight rules. So you may want to take this before Judge Brown tomorrow for an opinion from him as to whether or not it requires a finding of good cause.

[THE PROSECUTOR]: Your Honor, if I may?

THE COURT: I'm not qualified.

[THE PROSECUTOR]: We have already called it for trial.

THE COURT: Mr. Bates, *I don't have the authority under the law to find good cause.* Now, if you take it before Judge Brown he can either say I find good cause or I don't need to find good cause, but *that's something that he has to do, not me,* okay? *So I would suggest in an abundance of caution that you take the matter before Judge Brown tomorrow.*

(Emphasis supplied).

The formal request for a postponement was accordingly filed by the attorney for Morris. Judge Brown ruled on the request and found that there was, indeed, good cause to postpone the case to April 8. Judge Brown indicated that Morris himself had "issues" with whether "this delay by his attorney is a *Hicks* violation."

After doing motions in Pt. 7 *the defense attorney, Mr. Fleming, needs to be out of town next week.* Pt. 7 wants and has scheduled the trial to start April 8th Monday. *Defendant Morris has issues with his speedy trial delay and if this delay by his attorney is a Hicks violation.* (Emphasis supplied). Judge Brown resolved Morris's "issue" by finding good cause to carry the trial date over to April 8.

Morris now seeks to exploit the hypertechnicality that Judge Brown's good cause ruling of March 27 did not, after all, turn out to be the critical ruling that carried the trial date over the 180–day limit. Morris argues that in the absence of yet another ruling by Judge Brown on April 8 itself, *Hicks* was violated and all charges against him must be dismissed. We do not agree.

The issue was presented to Judge Brown, at Morris's express request, as if Judge Brown were called upon to make the critical *Hicks* ruling. Judge Brown thought he was making the critical ruling. Judge McCurdy thought that Judge Brown had made the critical ruling. All three counsel at the time thought that Judge Brown had made the critical ruling. Having presented the issue to Judge Brown for a critical ruling, Morris's counsel, we hold, is estopped from now arguing that Judge Brown's ruling, although counsel at the time did not realize it, failed by a day to be actually critical. The observations of Judge Wilner, under very similar circumstances, in *State v. Lattisaw,* 48 Md.App. 20, 28–29, 425 A.2d 1051 (1981), are equally pertinent here.

> *Defense counsel presumably can count to 180 as well as prosecutors; · they know when they entered their appearances—when the clock began to tick—and they can figure out when the time under the Rule expires. These were not inexperienced counsel; according to the record, both attorneys had extensive background in the trial of criminal · cases and were well aware of both the Rule and the interpretation given to it in Hicks.* They both agreed to the June 9 date because it was convenient to them and, in the absence of any contrary indication, we assume was acceptable to their clients. . . . *To require dismissal of an indict-*

*ment in such a case would be tantamount to doing precisely what the Court said was inappropriate—permitting "the defendant to gain advantage from a violation of the rule when he [through counsel] was a party to that violation."*
(Emphasis supplied).

The State in this case was ready for trial at all pertinent times. The court was also available. Judge McCurdy was ready to begin selecting a jury on Monday, April 1. It was at that point that the one-week delay requested by and granted to Morris's counsel carried the scheduling over and into the paternity leave requested by and granted to Everett's counsel. Although, to be sure, dealing with a single defense attorney instead of two, the observations of this Court in *Dyson v. State,* 122 Md.App. 413, 417–18, 712 A.2d 573 (1998), *rev'd on other grounds sub nom. Maryland v. Dyson,* 527 U.S. 465, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999), are pertinent here:

> There was still, to be sure, ample time within which to reschedule the trial before the March 4 deadline. *It was defense counsel, however, who indicated that he would be out of the state for the entire month of February. A scheduling accommodation for the benefit of defense counsel is presumptively an aspect of the total defense interest and not something antithetical to it.* On behalf of the appellant, therefore, there was filed, through his attorney, a "Waiver of the 180–Day Rule." The appellant, with ill grace, now seeks to repudiate that action taken by his agent on his behalf. He may not do so.

(Emphasis supplied).

## The *Hicks* Sanction Is Prophylactic in Purpose

Morris pushes for a rigid and inflexible application of the dismissal sanction. To dismiss all charges against a co-defendant because of a hypertechnical violation of a scheduling rule in a case involving the murder of the crime victim is an extreme sanction that should never be applied automatically or mechanically.[5] Rather than impose such a heavy-handed

---

5. As Judge Rodowsky observed in his dissent in *Capers v. State,* 317 Md. 513, 522, 565 A.2d 331 (1989):

sanction mindlessly, any civilized appellate court must, stop and ask what such a sanction would actually accomplish in the case before it.

It was in *State v. Brown*, 307 Md. 651, 658, 516 A.2d 965 (1986), that Judge Eldridge made it clear that the purpose of the *Hicks* rule and the purpose of the sanction of dismissal are not for the benefit of the defendant. The sanction is a prophylactic measure aimed at court personnel, in effect punishing them when they fail to follow the prompt scheduling requirements.

> *The sanction of dismissal,* where that sanction is applicable, *is not for the purpose of protecting a criminal defendant's right to a speedy trial;* instead, *it is a prophylactic measure* to further society's interest in trying criminal cases within 180 days.

(Emphasis supplied). See also *Calhoun v. State*, 299 Md. 1, 10–12, 472 A.2d 436 (1984).

*Farinholt v. State*, 299 Md. 32, 41, 472 A.2d 452 (1984), had similarly pointed out:

> *Dismissal of a serious criminal case,* on grounds unrelated to the defendant's guilt or innocence, *is a drastic sanction.* As the above-quoted language from *Frazier* indicates, *the dismissal sanction* for violating § 591 and Rule 746 *should only be applied when it is needed, as a prophylactic measure,* to further the purpose of trying a circuit court criminal case within 180 days.... The defendant, of course, remains protected by his federal and state constitutional rights to a speedy trial.

(Emphasis supplied). See also *State v. Frazier*, 298 Md. 422, 429, 470 A.2d 1269 (1984); *Goins v. State*, 293 Md. 97, 109, 442 A.2d 550 (1982).

---

The logic of turning a convicted criminal loose on the community in order to correct an administrative problem continues to elude me. *See Calhoun v. State*, 299 Md. 1, 13, 472 A.2d 436, 442 (1984) (Rodowsky, J., dissenting).

### The "Good Faith" Exception To the *Hicks* Sanction

Prophylactic sanctions, by their very nature, give rise to "good faith" exceptions. *Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984); *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). If it were not so, we should foolishly, at times, pay the heavy price of applying the sanction while receiving absolutely no countervailing benefit.

The application of the prophylactic rule of dismissal would serve no purpose in this case. On March 27 Judge McCurdy required counsel to go to Judge Brown because of his reasonable and "good faith" belief that a postponement of the case to April 8 would carry it beyond the *Hicks* deadline.[6] On the next day, Judge Brown made his good cause ruling because he, in good faith, also believed that April 8 was beyond the *Hicks* deadline. Judge McCurdy did what he reasonably believed the system required of him. Judge Brown did what he reasonably believed the system required of him. The mindlessly arbitrary application of the sanction of dismissal in a case such as this would achieve no conceivable deterrent effect on conscientious trial judges or conscientious administrative judges.[7] We will not apply so heavy a sanction if it could serve no conceivable beneficial purpose.

### Random *Hicks* Afterthoughts

Because of our holding in that regard, it is redundant to point out that Morris's trial could not possibly have gone forward on April 8 in any event. His trial was consolidated

---

6. At oral argument, we ourselves engaged in the same sort of reliance. We accepted the representations of counsel as to what was the 180th day and what was the 181st day. We did not pull out pencil, paper, and last year's calendar and make our own computation.

7. A case such as this, involving two co-defendants, starkly illustrates how purely arbitrary an automatic application of the sanction could be. The two co-defendants proceeded from arraignment to sentencing on precisely the same trial schedule. It is unconscionable that one should go free while the other goes to prison because of a difference in their procedural postures that was randomly inconsequential.

with that of his co-defendant Everett. At that point the trial was an indivisible unit and the absence of Everett's counsel precluded it from going forward on that day. The only way that Morris alone could have been tried on that day would have been if he had first obtained a trial severance. Morris, however, never moved for such a severance. Absent a defense request, it was not the responsibility of Judge McCurdy to order a trial severance *sua sponte.*

It is also unnecessary for us to consider the State's alternative theory that this case was actually called for trial on April 8 and thereafter was simply "stacked" in a day-to-day basis behind another murder case (State v. Whiting). As the State explained:

> At that time period, what we did is we moved the Whiting case to the head in terms of the row of cases to be tried. That case then was tried. We were in trial with that case. When that case was over, we then attempted to try the Everett and Morris case because that case was stacked in this courtroom.

In later ruling on the motion to dismiss the charges, Judge McCurdy announced that the case had never been sent back to the assignment office but had been "carried from day to day on my docket. Now, they don't appear on the print-out docket, but they do appear in my bench notes as being pending in my courtroom." Judge McCurdy further explained:

> Now, technically, that case had been carried from day to day in my court pending trial and called for trial until that day. It had been called prior to *Hicks* and it was essentially in a suspended state for various reasons from that day until the day that it came in with Ms. Ranier.

Because it is unnecessary for us to decide whether this trial actually did timely begin on April 8, we are relieved of any responsibility of exploring the legal significance of the "stacking" phenomenon. We are further relieved of the even heavier responsibility of understanding factually what the "stacking" phenomenon is all about.

## VI. The Right to be Present at One's Trial Does Not Embrace A Right to be Seated Beside the Jurors

The final contention is raised by Morris alone. He was present at every stage of the trial. He was not prevented from looking at and examining every exhibit offered by the State. He objected, however, that he was not able to see the exhibits at the precise moment and from the exact vantage point that the jury saw them because, for security reasons, he was not permitted to move over and to sit or stand beside the jurors as the exhibits were being shown to them. In denying Morris's request "to move over next to the jury," Judge McCurdy ruled:

[T]he corrections officers are not going to want to move the defendants over next to the jury.

Morris now contends that that denial erroneously denied him his constitutional right to be present at all stages of his trial.

This contention will not detain us long. We reject it.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**

ADKINS, Judge, concurring.

I agree with the majority in all respects regarding appellant Morris. I concur with the holding of the majority that appellant Everett's conviction should be affirmed, but I do not agree that the trial court appropriately exercised its discretion in refusing to grant Everett's motion to strike Juror No. 521 for cause. This motion was based on that juror's expressed concern that he might be biased against the defendants because two of his brothers had been "gunned down in the street." Although the trial court attempted to rehabilitate him, by asking if he could live up to the juror's oath to listen fairly and impartially to the evidence and make a decision based on that evidence without any bias, he never offered definite assurance that he could.

Rather, he continued to hedge, notwithstanding the trial court's efforts toward rehabilitation. When the trial court asked the above noted question, he answered, "I probably

could, yes, but that does not relieve the fact that I have experience—." He was cut off by the court, which said: "[E]veryone brings their life experience. . . ." When he was asked again, "do you think it would affect your ability to be fair?" he again expressed uncertainty, indicating that it was "hard to say, but I think that I would probably—I mean, you know, hear the evidence that would be—." When the court interrupted him again, asking if he "could keep an open mind until the end," Juror No. 521 still was unable to answer unequivocally. He could only say, "I probably could. I probably could." In my view, the juror's uncertainty about his ability to be fair, despite leading questions from the judge, was fatal to his qualification to be a juror.

· None of the cases cited by the majority support the proposition that a juror who has articulated his own bias, can be rehabilitated without affirming that he could be a fair and impartial juror, who would decide the case only on the facts presented. *See Calhoun v. State*, 297 Md. 563, 578–83, 468 A.2d 45 (1983)(after initially expressing partiality, prospective juror affirmed that he could be a "fair and impartial juror in deciding this particular case only on the facts and evidence presented"); *Couser v. State*, 282 Md. 125, 383 A.2d 389 (1978)(did not involve challenge for cause; court denied defendant's motion to disclose prosecutor's juror dossier); *Kujawa v. Baltimore Transit Co.*, 224 Md. 195, 201, 167 A.2d 96 (1961)(suit for damages from automobile accident; held not error for trial court to decline to propound a question to prospective jurors regarding their opinion as to the adequacies or inadequacies of jury verdicts in negligence cases); *Garlitz v. State*, 71 Md. 293, 300, 18 A. 39 (1889) (each prospective juror swore that he was without bias or prejudice and felt confident that he could give the defendant a perfectly fair and impartial trial, upon the evidence alone) (1889); *cf. Irvin v. Dowd*, 366 U.S. 717, 727–28, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961)(conviction reversed because of biased jury, even though jurors said they could be fair and impartial).

Cases in which a prospective juror indicated some bias, but upon further questioning, expressed the unequivocal view that

he or she could decide the case fairly and impartially, based on the evidence, are legion. In these, convictions are generally upheld. I have found no cases, however, upholding a trial court's refusal to strike for cause a prospective juror, who, after expressing an initial bias, was unable to state without reservation that he or she could decide the case fairly and impartially based on the evidence.

In *Brown v. State,* 728 So.2d 758 (Fla.Ct.App.1999), a Florida appellate court reversed a conviction of a defendant when the trial court refused to grant the defendant's motion to strike for cause. The juror in *Brown* initially explained that " 'a good friend . . . was involved in an attempted murder where somebody tried to shoot him and I haven't really been able to deal with that as far as not having a biased opinion on people involved in armed robbery and cases like that. . . . I don't know—anything about his case but I have really—I have little patience for these types of crimes.' " *Id.* at 759. When asked by the trial court whether he could set aside his "personal feelings concerning crime or what happened to your friend," and be impartial, the prospective juror said: " 'I am not really positive about that, but I guess that I would just have to go through it. I really couldn't say for sure how I would react.' " *Id.*

When asked whether he could follow the court's instruction not to take his friend's experience into consideration and be impartial, he said: "Yeah, I think so." *Id.* The Florida Court of Appeals held that a trial court's

discretion is abused where the court refuses to excuse for cause a prospective juror who responds with equivocal or conditional answers, thus raising a reasonable doubt as to whether the prospect possesses the state of mind necessary to render an impartial decision. Even a cold transcript can reveal equivocal or conditional responses not reflective of a prospect's final detached determination to serve as a fair and impartial juror. A reviewing court may therefore, from time to time, and as to jury equivocations, find itself with a better view than the trial court because of the greater

amount of time available to it for rendering decisions. Such is the situation in this case.

*Id.* at 759 (citation omitted). Similarly, in this case, I believe that the "cold record" reveals sufficient "doubt as to whether the prospect possesse[d] the state of mind necessary to render an impartial decision." *See id.*

The Supreme Court has characterized the right to an impartial jury as our "most priceless" safeguard of individual liberty:

England, from whom the Western World has largely taken its concept of individual liberty and of the dignity and worth of every man, has bequeathed to us safeguards for their preservation, the most priceless of which is that of trial by jury. . . . In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. . . . The theory of the law is that a juror who has formed an opinion cannot be impartial.

*Irvin*, 366 U.S. at 721, 81 S.Ct. at 1642–43 (citations omitted).

In my view, to preserve this most "priceless safeguard" of individual liberty, a prospective juror who has admitted to some bias must, as a threshold requirement, be willing to unconditionally state his **own** belief in his ability to set that bias aside and be impartial. Here, Juror No. 521 did not do so. The prospect of a juror who harbored doubt about his impartiality threatens the safeguard of trial by an "indifferent jury."

Whether the trial court's erroneous refusal to strike this juror for cause merits a new trial raises another interesting question. The Court of Appeals anticipated the dilemma presented by this case in *Lockhart v. State*, 145 Md. 602, 620–21, 125 A. 829 (1924). There, the trial court initially allowed each party an unlimited number of peremptory strikes, but eventually reinstated a limit in order to conclude jury selection. On appeal, the defendants complained that the court's erroneous refusal to strike certain jurors for cause required them to use their peremptory challenges to keep those jurors off the jury, and thereby reduced the number of their peremp-

tory challenges and prevented them from fully exercising their peremptory rights. The Court of Appeals recognized the viability of that complaint, but held that the defendants had waived it by accepting the court's unusual offer not to strictly enforce the limit on peremptories.

In dictum, the Court opined:

**If the legal right of the defendants to the use of peremptory challenges had been actually reduced by any of the trial court's rulings, we should not require affirmative proof of resulting injury as a condition of reversal.** *Id.* at 620, 125 A. 829.

In 1979 the Court of Appeals applied this principle in holding that, when the effectiveness of the parties' rights to peremptory strikes is impaired, reversal of the conviction is required. In *King v. State Roads Comm'n*, 284 Md. 368, 371, 396 A.2d 267 (1979), the Court ordered a new trial because the method used to select the jury denied the parties the full privileges of their peremptory strikes. After excusing jurors for cause from a 28 person jury panel, and allowing each party to use four peremptory strikes, the trial judge had to strike five additional jurors. That method diluted the parties' peremptory strikes by effectively giving the trial court more strikes than either party. The Court of Appeals explained that "the importance of the peremptory challenge requires that any significant deviation from the prescribed procedures that impairs or denies the privilege's full exercise is error that, unless waived, ordinarily will require reversal without the necessity of showing prejudice." In support of its holding, the Court cited the Supreme Court's decision in *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), presumably for its language that a "denial or impairment of the right [to exercise peremptory challenges] is reversible error without a showing of prejudice." *Id.*, 380 U.S. at 219, 85 S.Ct. at 835.

In *United States v. Martinez–Salazar*, 528 U.S. 304, 317 n. 4, 120 S.Ct. 774, 782 n. 4, 145 L.Ed.2d 792 (2000), however, the Supreme Court disavowed their own language in *Swain*, char-

acterizing it as "unnecessary to the decision in that case," and "founded on a series of our early cases decided long before the adoption of harmless-error review." The *Martinez–Salazar* Court held that "a defendant's exercise of peremptory challenges ... is not denied or impaired when the defendant chooses to use a peremptory challenge to remove a juror who should have been excused for cause." *Id.*, 528 U.S. at 317, 120 S.Ct. at 782. The majority opinion reasoned that the trial court's error in its ruling on the motion to strike for cause did not compel the defendant to challenge the juror peremptorily, "thereby reducing his allotment of peremptory challenges by one." Instead, the defendant could have allowed the challenged juror to sit on the jury, and pursue a Sixth Amendment challenge on appeal. The Court considered this a "hard choice [rather than] no choice." *Id.*, 528 U.S. at 315, 120 S.Ct. at 781.

Justice Souter expressed the view in his concurring opinion that

[t]he resolution of juror-bias questions is never clear cut, and it may well be regarded as one of the very purposes of peremptory challenges to enable the defendant to correct judicial error on the point. Indeed that *must* have been one of their purposes in earlier years, when there was *no appeal* from a criminal conviction.

*Id.*, 528 U.S. at 319, 120 S.Ct. at 783.

I am persuaded by the views expressed in both the majority and concurring opinions in *Martinez–Salazar*. That case is not controlling because the right to exercise peremptory challenges is not created by the Constitution, so that the number and the manner of their exercise is to be determined by the states. *See Ross v. Oklahoma*, 487 U.S. 81, 89, 108 S.Ct. 2273, 2279, 101 L.Ed.2d 80 (1988). I am also persuaded, however, that if the Court of Appeals were to consider the issue in this case, in light of the reasoning of the Supreme Court in *Martinez–Salazar*, it would hold that because Everett exercised one of his peremptory strikes to remove Juror No. 521, he suffered no prejudice, and would not be entitled to a new

trial. Accordingly, I concur in the majority decision to affirm Everett's conviction.